HAROLD GOODRICH *v.* WATERBURY REPUBLICAN-AMERICAN, INC.

PETERS, PARSKEY, ARMENTANO, SHEA and DALY, Js.

Argued February 11—decision released August 17, 1982

*William J. St. John, Jr.,* with whom was *Joseph W. Doherty,* for the appellant (plaintiff).

*John H. Cassidy, Jr.,* with whom, on the brief, was *W. Fielding Secor,* for the appellee (defendant).

DALY, J. The plaintiff brought this action to recover damages for allegedly libelous statements that were printed about him in the defendant newspaper in November, 1974. When all the evidence was in, the court directed a verdict for the defendant. The plaintiff appeals from the final judgment and assigns as error the court's action in directing the verdict and in refusing to set the verdict aside. "In reviewing the action of the trial court, in first directing and thereafter refusing to set aside the verdict, we consider the evidence, including inferences which reasonably may be drawn from this evidence, in the light most favorable to the plaintiff." *Pinto* v. *Spigner,* 163 Conn. 191, 193, 302 A.2d 266 (1972).[1]

---

[1] While this manner of review applies to all civil cases, the *standard* by which the evidence is reviewed in a libel case is governed by *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), and its progeny. *Moriarty* v. *Lippe,* 162 Conn. 371, 377-78, 294 A.2d 326 (1972); accord *Guam Federation of Teachers, Local 1581, A.F.T.* v. *Ysrael,* 492 F.2d 438, 441 (9th Cir. 1974), cert. denied, 419 U.S. 872, 95 S. Ct. 132, 42 L. Ed. 2d 111 (1974).

The jury could reasonably and logically have found the following facts: In November, 1974, the plaintiff was a real estate builder and developer in the town of Middlebury. He had been in that business for twelve years and had built fifty-seven homes. At this time, the plaintiff was also the owner and developer of a shopping center known as the Middlebury Hamlet (hereinafter the Hamlet) that he had constructed on route 64 in Middlebury. The land for this development was purchased in May, 1973, after the plaintiff had applied to the Middlebury planning and zoning commission (hereinafter the commission) for a permit to relocate a brook on the property. This permit was granted and the site plan was approved by the commission in March or April, 1973, provided that the plaintiff fulfill three conditions: (1) that he install riprapping; (2) that he establish an effective settling basin; and (3) that he take all other necessary measures to prevent erosion. The commission also required the plaintiff to post a contractor's bond to ensure the fulfillment of these conditions, and a bond having an expiration date of May, 1974, was subsequently posted.

Construction began in August, 1973, and was substantially completed by April, 1974. About this time, however, the commission became concerned about a drainage problem caused by the plaintiff's failure to fulfill the conditions of the permit. The plaintiff appeared before the commission in June and represented that he was working on the problem and that it was 80 percent solved. The commission's continuing concern led it to request the assistance of the United States Department of Agriculture–Soil Conservation Service (hereinafter U.S.D.A.–S.C.S.), as well as to pass a resolution at its September meeting that set November

7 as the deadline for completing the settling basin. When it met on November 7, the commission approved the recommendations of the U.S.D.A.– S.C.S., which established new compliance deadlines of December 5, 1974 and May 15, 1975.[2]

At the time of this meeting, approximately 37 percent of the available rental space in the shopping center was occupied. Mechanic's liens totaling $60,486.38 had been filed against the Hamlet, as well as a suit claiming a brokerage commission for the placement of mortgage financing. The plaintiff was in default under his construction mortgage, which was subsequently foreclosed. Finally, the commission had met with police officials concerning traffic problems that had developed on route 64 after construction of the Hamlet.

The defendant's reporter, Mary Kane Skowronski, was assigned to cover news exclusively in Middlebury. After attending the commission meeting of November 7, she wrote articles about the Hamlet that were printed in the defendant's newspaper on November 8 and 10.[3] The plaintiff requested in writing that the defendant retract certain statements in the articles, but no retraction was made. Thereafter, the plaintiff brought the present suit against the defendant for libel and invasion of privacy, to which the defendant raised the defense of truth and the privilege of "fair comment."

I

We begin with the critical determination of whether, as a matter of law, the allegedly libelous

[2] The November 7 meeting was attended by the defendant's reporter, Mary Kane Skowronski.

[3] Both articles are set forth as an appendix to this opinion, since the claims presented must be viewed in light of the entire publication.

assertions can reasonably be characterized as either a fact or an opinion, since this determination will guide our analysis.[4] See *Letter Carriers* v. *Austin,* 418 U.S. 264, 282–87, 94 S. Ct. 2770, 41 L. Ed. 2d 745 (1974); *Gregory* v. *McDonnell Douglas Corporation,* 17 Cal. 3d 596, 601, 552 P.2d 425 (1976); *Rinaldi* v. *Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 381, 366 N.E.2d 1299 (1977). A statement can be defined as factual if it relates to an event or state of affairs that existed in the past or present and is capable of being known. See generally 1 Harper & James, Torts § 5.28, p. 458 n.11, § 7.8, p. 560; Black's Law Dictionary (5th Ed. 1979); Ballentine's Law Dictionary (3d Ed. 1969). In a libel action, such statements of fact usually concern a person's conduct or character. 3 Restatement (Second), Torts § 565. An opinion, on the other hand, is a personal *comment* about another's conduct, qualifications or character that has some basis in fact. Id., § 566, p. 171.

This distinction between fact and opinion cannot be made in a vacuum, however, for although an opinion may appear to be in the form of a factual statement, it remains an opinion "if it is clear from the *context* that the maker is not intending to assert another objective fact but only his personal comment on the facts which he has stated." (Emphasis added.) Ibid. Thus, while this distinction may be

---

[4] As a general rule, the defense of truth applies to *statements of fact; Hogan* v. *New York Times Co.,* 313 F.2d 354, 356 n.2 (2d Cir. 1963); Eldredge, The Law of Defamation (1978) § 63, p. 323; 3 Restatement (Second), Torts § 581A; while the privilege of fair comment applies to *expressions of opinion. Hogan* v. *New York Times Co.,* supra; 3 Restatement (Second), Torts § 566. In order to preserve this distinction between statements and expressions, we use the word "assertion" when referring to the allegations of libel in a generic sense.

"somewhat nebulous . . . [t]he important point is whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact."[5] 1 Harper & James, op. cit., § 5.28, p. 458; *Mashburn* v. *Collin,* 355 So. 2d 879, 885 (La. 1977).

## A

In a civil action for libel, where the protected interest is personal reputation, the rule in Connecticut is that the truth of an allegedly libelous statement of fact provides an absolute defense.[6] *Dacey* v. *Connecticut Bar Assn.,* 170 Conn. 520, 538, 368 A.2d 125 (1976), citing *Cox Broadcasting Corporation* v. *Cohn,* 420 U.S. 469, 489–90, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975). Contrary to the common law

---

[5] Although the difficulty in distinguishing fact from opinion has been recognized by a number of writers; see, e.g., Titus, "Statement of Fact versus Statement of Opinion–A Spurious Dispute in Fair Comment," 15 Vand. L. Rev. 1203 (1962); Noel, "Defamation of Public Officers and Candidates," 49 Col. L. Rev. 875, 878 (1949); note, "Fair Comment," 62 Harv. L. Rev. 1207 (1949); the approach taken here overcomes the criticisms presented by them. See Titus, supra, 1216, 1221; Noel, supra, 879; note, Harv. L. Rev., supra, 1213.

Where the court cannot reasonably characterize the allegedly libelous words as either fact or opinion because, for example, innuendo is present, this becomes an issue of fact for the jury, which would preclude a directed verdict. This is similar to the rule which requires the jury to decide whether an ambiguous assertion is reasonably capable of a defamatory meaning. *Burns* v. *Telegram Publishing Co.,* 89 Conn. 549, 552, 94 A. 917 (1915), quoting *Donaghue* v. *Gaffy,* 54 Conn. 257, 266, 7 A. 552 (1886).

[6] While at common law, truth was an affirmative defense to be pleaded by the defendant, as a practical matter the burden of proving the falsity of the publication has been shifted to the plaintiff, in light of *New York Times Co.* and its progeny. *Wilson* v. *Scripps-Howard Broadcasting Co.,* 642 F.2d 371, 376 (6th Cir. 1981); *Rinaldi* v. *Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 366 N.E.2d 1299 (1977).

rule that required the defendant to establish the literal truth of the precise statement made, the modern rule is that only substantial truth need be shown to constitute the justification. *Johnson* v. *Whipple,* 117 Conn. 599, 601–602, 169 A. 619 (1933); *Stow* v. *Converse,* 4 Conn. 17, 33 (1821). "It is not necessary for the defendant to prove the truth of every word of the libel. If he succeeds in proving that 'the main charge, or gist, of the libel' is true, he need not justify statements or comments which do not add to the sting of the charge or introduce any matter by itself actionable." (Footnote omitted.) Gatley, Libel and Slander (2d Ed.) p. 178; see Eldredge, The Law of Defamation (1978) § 71; *Orr* v. *Argus-Press Co.,* 586 F.2d 1108, 1112 (6th Cir. 1978). The issue is whether the libel, as published, would have a different effect on the reader than the pleaded truth would have produced. *Griffin* v. *Clemow,* 28 Conn. Sup. 109, 111, 251 A.2d 415 (1968), citing *Fleckenstein* v. *Friedman,* 266 N.Y. 19, 23, 193 N.E. 537 (1934).

Upon examining the statements complained about by the plaintiff, we note that three of them are clearly factual: (1) "On the surface, the Middlebury Hamlet is an attractive colonial-type shopping complex located about two miles from the Four Corners business district"; (2) "Harold K. Goodrich, owner and developer, faces close to $100,000.00 in liens and lawsuits against the property, and possibly another lawsuit from the town's Planning and Zoning Commission"; (3) "A plumbing and heating firm, a lumber company, and a paving company have filed a total of $60,486.00 in liens against the Hamlet developer. And a $30,000.00 suit was filed against Goodrich for failure to pay a brokerage commission

on the Hamlet's mortgage financing." We need not inquire further, however, since the plaintiff conceded during direct examination that these statements were true, and this concession creates an absolute bar to his claim of libel as to these statements. *Cox Broadcasting Corporation* v. *Cohn*, supra; *Dacey* v. *Connecticut Bar Assn.*, supra.

The remaining allegations of libel consist of statements of fact combined with opinions or comments based upon those facts. Although some authorities have applied the defense of truth in such circumstances; *Commercial Publishing Co.* v. *Smith*, 149 F. 704, 706–707 (6th Cir. 1907); Gatley, op. cit., p. 177; Prosser, Torts (4th Ed. 1971) § 116, pp. 796–97; others have expressly limited the defense of truth to justify only statements of fact. *Hogan* v. *New York Times Co.*, 313 F.2d 354, 356 n.2 (2d Cir. 1963); Eldredge, The Law of Defamation (1978) § 63, p. 323; 3 Restatement (Second), Torts § 581A. We need not choose between these authorities, however, for "[w]here the comment or opinion deals with matters of public interest, the privilege of 'fair comment' is involved which affords an immunity of considerably wider latitude." (Footnote omitted.) 1 Harper & James, op. cit., § 5.20, p. 419.

## B

The privilege of "fair comment," which was one of the most important privileges realized at common law, was a qualified privilege to express an opinion or otherwise comment on matters of public interest. *Charles Parker Co.* v. *Silver City Crystal Co.*, 142 Conn. 605, 615, 116 A.2d 440 (1955). "Traditionally, fair comment concerned persons, institutions or

groups who voluntarily injected themselves into the public scene or affected the community's welfare, such as public officials, political candidates, community leaders from the private sector or *private enterprises which affected public welfare* . . . ."[7] (Emphasis added.) *Mashburn* v. *Collin*, supra, 882. The privilege was elevated to constitutional status, however, by a number of United States Supreme Court cases starting with *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), and those cases govern our inquiry. See Prosser, Torts (4th Ed. 1971) § 115, p. 792, § 118, p. 819.

In *New York Times Co.*, the court (p. 280) rejected the common law standard of malice and held that media defendants were not liable for defamatory statements of fact or opinion about a public official absent proof that a statement was published with " '*actual* malice'—that is, with knowledge that it was false or not." (Emphasis added.) The constitutional privilege was first extended to

---

[7] Under the common law there was a split over whether the privilege of fair comment extended to false statements of *fact*. Connecticut followed the more liberal, albeit minority, rule extending the privilege to false statements that were made with a good faith belief in their truth and without the intent to harm one's reputation; *Charles Parker Co.* v. *Silver City Crystal Co.,* 142 Conn. 605, 615–16, 116 A.2d 440 (1955) ; see also Prosser, Torts (4th Ed. 1971) § 118, pp. 819–20; but see 1 Harper & James, Torts § 5.26, p. 449 (characterizing minority rule as qualified privilege extending only to cases involving candidates for public office) ; the matter appeared to be resolved in favor of the minority rule in *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), although the American Law Institute makes a further distinction between "pure" and "mixed" opinion. 3 Restatement (Second), Torts § 566. See footnotes 9 and 10 and accompanying text, infra. We need not address this issue, however, since the allegations of libel are easily characterized as either fact or opinion in the present case.

public figures;[8] *Curtis Publishing Co.* v. *Butts,* 388 U.S. 130, 154–55, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967) (plurality opinion); and later to private individuals who became involuntarily associated with matters of "public or general concern." *Rosenbloom* v. *Metromedia, Inc.,* 403 U.S. 29, 48, 91 S. Ct. 1811, 29 L. Ed. 2d 296 (1971) (plurality opinion). In both of those cases, the plaintiff was still required to prove the "actual malice" standard of *New York Times Co.*

The *Rosenbloom* rationale was ultimately rejected, however, in *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974). In so doing, the court noted that to apply this standard to public figures merely on the basis of their involvement in matters of "public or general interest" would inadequately serve the competing values at stake, namely, the societal interest in "uninhibited, robust, and wide-open" debate on public issues; id., 340, quoting *New York Times Co.* v. *Sullivan,* supra, 270; and the "legitimate state interest . . . [in] the compensation of individuals for the harm inflicted on them by defamatory falsehood." *Gertz* v. *Robert Welch, Inc.,* supra, 341. "On the one hand, a private individual whose reputation is injured by defamatory falsehood that does not concern an issue of public or general interest has no recourse unless he can meet the rigorous requirements of *New York Times* [*Co.*] . . . . On the other hand, a publisher or broadcaster of a defamatory

---

[8] In analyzing this issue, an argument could be made that the plaintiff was a public figure since he was deeply involved in the future development of Middlebury. See, e.g., *Greenbelt Cooperative Publishing Assn., Inc.* v. *Bresler,* 398 U.S. 6, 8, 90 S. Ct. 1537, 26 L. Ed. 2d 6 (1970). It was conceded at oral argument, however, that the plaintiff is a private individual. This concession guides our determination of whether the remaining statements fall within the asserted privilege.

error which a court deems unrelated to an issue of public or general interest may be held liable in damages even if it took every reasonable precaution to ensure the accuracy of its assertions." *Gertz* v. *Robert Welch, Inc.*, supra, 346.

*Gertz,* therefore, reestablished the *New York Times Co.* approach of varying the level of constitutional privilege for defamatory falsehood according to the *status* of the person defamed. 3 Dooley, Modern Tort Law (1977) § 36.07. The court held that "so long as they do not impose liability without fault, the states may define for themselves the appropriate standard of liability for a publisher or broadcaster of a defamatory falsehood injurious to a private individual." Ibid, citing *Gertz* v. *Robert Welch, Inc.,* supra, 347. We need not define this standard here, however, for a close reading of *Gertz* reveals that the court "was speaking in terms only of libelous misstatements of *fact* and that the mere comment or opinion on public matters, even though defamatory, enjoys the *unqualified* protection of the First Amendment." (Emphasis added.) *Mashburn* v. *Collin,* 355 So. 2d 879, 884 (La. 1977), citing Hanson, Libel and Related Torts (Sup. 3 1976) § 141. "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. *But there is no constitutional value in a false statement of fact."* (Emphasis added.) *Gertz* v. *Robert Welch, Inc.,* supra, 339–40.

As a general rule, therefore, an opinion is privileged as fair comment "only when the facts on which it is based are truly *stated* or *privileged* or otherwise *known* either because the facts are of

common knowledge or because, though perhaps unknown to a particular recipient of the communication, they are readily accessible to him." (Emphasis added.) 1 Harper & James, op. cit., § 5.28, p. 459; 3 Restatement (Second), Torts § 566 ("pure" opinion is absolutely privileged). If the facts that are criticized or commented upon are *not* stated or known, however, then fair comment is no defense. The reason for this distinction is as follows: an opinion must be based upon facts; if the facts are neither known nor stated, then a defamatory opinion implies that there are undisclosed defamatory facts which justify the opinion. 1 Harper & James, op. cit., § 5.28, pp. 458–59; 3 Restatement (Second), op. cit., § 566 ("mixed" opinion); *Hoover* v. *Peerless Publications, Inc.,* 461 F. Sup. 1206, 1209 (E.D. Pa. 1978). The damage of such an implication is that the person defamed becomes the victim of the prejudiced and distorted judgment of not only the defamer, but also of everyone who hears and believes the opinion without knowing that it is based on incorrect and untrue facts. The precise contours of the privilege of fair comment have never been fully articulated, since the United States Supreme Court chose to lay down broad rules of general application rather than opt for an ad hoc resolution of the competing interests in each case. *Gertz* v. *Robert Welch, Inc.,* supra, 343. Our review of the case law from *New York Times Co.* through *Gertz,* however, leads us to conclude that expressions of "pure" opinion (those based upon known or disclosed facts) are guaranteed virtually complete constitutional protection.[9] Ex-

---

[9] The constitution does not protect opinions, however, which invade the legitimate expectations of privacy of the person about whom the opinion was stated. 3 Dooley, Modern Tort Law (1981 Sup.) § 35.02; see part II, infra.

pressions of "mixed" opinion, however, are privileged only where made (1) by members of the press or news media; (2) about matters of public interest or concern; and (3) without knowingly or recklessly distorting the facts upon which they are based.[10]

The basis of the plaintiff's claim, although not clearly articulated in his brief, appears to be that the articles were not privileged as fair *comment* because they contained a number of disparaging *factual* assertions: that the Hamlet was a "ghost town" and "a mere shell of a shopping center" and that the Hamlet was "plagued" by a "host of traffic, conservation and financial worries" and was "up to its rooftop in troubles." He states, arguendo, that even if the privilege were applicable, it was abused because the articles were "designedly or unnecessarily or negligently excessive" and constituted "fictionalized or misrepresented news reports." Finally, he argues that the defendant's reporter conducted an irresponsible and reckless investigation of the facts, including her failure to interview him personally, and that this created a question of fact as to liability which the court usurped by directing a verdict.

Whether the two newspaper articles are privileged as fair comment is an issue of law. *Charles Parker Co.* v. *Silver City Crystal Co.*, supra, 615; accord *Hogan* v. *New York Times Co.*, 211 F. Sup.

---

[10] This is a variation of the actual malice standard, since an opinion cannot properly be characterized as either true or false. An opinion is merely an interpretation of facts, and the relationship between them determines whether the opinion conforms to sound critical standards. Thus, a mixed opinion is entitled to constitutional protection only where a reasonable person would characterize the opinion as "good" or "sound" in light of the facts that were not disclosed in the publication. 1 Harper & James, Torts § 5.28, p. 460.

99, 107 n.9 (D. Conn. 1962), aff'd, 313 F.2d 354 (2d Cir. 1963). We conclude that the privilege applied here since the articles involved a matter of public interest. *Charles Parker Co. v. Silver City Crystal Co.,* supra. The plaintiff was clearly engaged in a "private enterprise which affected the public welfare"; *Mashburn v. Collin,* supra; namely, the construction of a shopping center. *Orr v. Argus-Press Co.,* 586 F.2d 1108, 1116 (6th Cir. 1978). Whether this privilege was abused, however, is an issue of fact; *Hogan v. New York Times Co.,* supra; *Charles Parker Co. v. Silver City Crystal Co.,* supra; and we examine these facts in the light most favorable to the plaintiff.

As in the defense of truth, the privilege of fair comment requires us to read the allegedly libelous articles in their totality, in the context in which they were published.[11] *Information Control* v.

---

[11] These articles are set out in an appendix, infra. The specific assertions complained about by the plaintiff are set forth below with italics designating the precise words underlying this claim, as indicated in his brief.

(1) "The run-off from the Hamlet has long been a *sore spot* with both the Planning and Conservation Commissions, since Goodrich was to have completed all the soil erosion work several 'months ago." (November 8, 1974.)

(2) "A near *ghost-town* of a shopping center on Route 64 is *up to its rooftop in troubles.*" (November 10, 1974.)

(3) "But *behind the pretty exterior lies a host of traffic, conservation and financial worries for the Hamlet's developer and town officials.*" (November 10, 1974.)

(4) "Besides the suits and liens, the Hamlet, open for business since early spring, is still a *mere shell of a shopping center* area with several vacant storefronts and a string of empty office spaces." (November 10, 1974.)

(5) "Traffic problems, too, *plague* the Hamlet. *A number of residents have commented that the development is in a badly situated spot on heavily travelled Route 64, and drivers going the maximum speed limit ride by the Hamlet without ever realizing it's there.*" (Emphasis added.) (November 10, 1974.)

*Genesis One Computer Corporation,* 611 F.2d 781, 784 (9th Cir. 1980); accord *Myers* v. *Boston Magazine Co.,* 380 Mass. 336, 342, 403 N.E.2d 376 (1980); "In order for a statement to be defended as fair comment it must be recognizable by the ordinary reasonable person as opinion and not as a statement of fact." *Mashburn* v. *Collin,* supra, 886. In applying this test, however, "[t]he court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published." *Information Control* v. *Genesis One Computer Corporation,* supra, 784.

## C

Applying these standards, we note that the defendant newspaper covered news of interest to Middlebury residents, as evidenced by reporter Skowronski's exclusive assignment to that town. In covering the problems surrounding the Hamlet, which was an item of interest to the local residents, she personally attended the meeting on November 7, 1974 and learned the facts that became the basis of her two articles. In writing these articles, the reporter was not limited to a dry recitation of the bare facts but was constitutionally permitted to use colorful expressions in a figurative, rather than literal, sense. See *Time, Inc.* v. *Johnston,* 448 F.2d 378, 384 (4th Cir. 1971); *Sellers* v. *Time, Inc.,* 299 F. Sup. 582, 585 (E.D. Pa. 1969). Taking the articles as a whole, we conclude that a reader would

reasonably understand the expressions "sore spot," "ghost town," "up to its rooftop in troubles," "mere shell of a shopping center" and "plagued by a host of traffic, conservation and financial worries" not as statements about an existing state of affairs–that is, as facts–but as colloquial and figurative expressions used to embellish facts that are disclosed in the articles.[12]

Furthermore, we note that the United States Supreme Court has not found actionable a number of words similar to the words herein which, "if not cliches, do have colloquial, figurative meanings." *Myers* v. *Boston Magazine Co.*, supra, 343. In *Greenbelt Cooperative Publishing Assn., Inc.* v. *Bresler,* 398 U.S. 6, 90 S. Ct. 1537, 26 L. Ed. 2d 6 (1970), for example, the court held that the word "blackmail" was nondefamatory where "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet." Id., 14, cited in *Pierce* v. *Capital Cities Communications, Inc.*, 576 F.2d 495, 508 (3d Cir. 1978); see also *Letter Carriers* v. *Austin*, 418 U.S. 264, 284, 94 S. Ct. 2770, 41 L. Ed. 2d 745

[12] "Sore spot" was a figurative expression used by the reporter to describe the effect that the erosion problems had on town officials; namely, "causing annoyance or irritation." Webster, Third New International Dictionary. This was fair comment because it was based on disclosed facts concerning the number of meetings that were held to enforce compliance with the conditions and deadlines. Similarly, "ghost town" and "mere shell of a shopping center" are figurative terms referring to the vacancies that existed in the unfinished shopping center, as disclosed in the articles. Finally, the terms "plagued by a host of traffic, conservation and financial worries" and "up to its rooftop in troubles" were figurative expressions to describe the myriad problems that existed in completing the Hamlet, as learned by the reporter at the November 7 meeting and as disclosed in the articles.

(1974)[13] (the word "scab" is protected by federal labor law); *Adreani* v. *Hansen,* 80 Ill. App. 3d 726, 728, 400 N.E.2d 679 (1980) (standard described as "innocent construction" rule). These cases are in accord with the general rule that fair comment may be "severe and may include ridicule, sarcasm, and invective"; *Hartmann* v. *Boston Herald-Traveler Corporation,* 323 Mass. 56, 61, 80 N.E.2d 16 (1948); and that the comment is not rendered unfair by the writer's flippant style; *Sellers* v. *Time, Inc.,* supra; or even by the use of gross exaggeration. *Cherry* v. *Des Moines Leader,* 114 Iowa 298, 304, 86 N.W. 323 (1901). "A comment is fair when it is based on facts truly stated and free from imputations of corrupt or dishonorable motives on the part of the person whose conduct is criticized, and is an *honest expression* of the writer's real opinion or belief. Mere exaggeration, slight irony or wit, or all those delightful touches of style which go to make an article readable, do not push beyond the limitations of fair comment. Facts do not cease to be facts because they are mixed with the fair and expectant comment of the story teller, who adds to the recital a little touch by his piquant pen." *Briarcliff Lodge Hotel, Inc.* v. *Citizen-Sentinel Publishers, Inc.,* 260

[13] Although the Supreme Court decided this case on the basis of federal labor law and did not consider the first amendment arguments advanced by the appellants; *Letter Carriers* v. *Austin,* 418 U.S. 264, 283 n.15, 94 S. Ct. 2770, 41 L. Ed. 2d 745 (1974); it appears that the word "scab" is also protected by the first amendment as opinion, even where it is pejorative, since "to use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies–like 'unfair' and 'fascist'–is not to falsify facts." *Cafeteria Union* v. *Angelos,* 320 U.S. 293, 295, 64 S. Ct. 126, 88 L. Ed. 58 (1943), cited in *Gregory* v. *McDonnell Douglas Corporation,* 17 Cal. 3d 596, 601–602, 552 P.2d 425 (1976).

N.Y. 106, 118-19, 183 N.E. 193 (1932); accord *Miller v. News Syndicate Co.,* 445 F.2d 356, 358 (2d Cir. 1971).

Accordingly, we conclude that the defendant was performing its wholly legitimate function as a newspaper in publishing articles arising from a public hearing involving a local real estate developer and builder. See generally *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler,* 398 U.S. 6, 13, 90 S. Ct. 1537, 26 L. Ed. 2d 6 (1970). Contrary to the plaintiff's assertion that the reporter investigated these news articles recklessly, her mere failure to interview the plaintiff personally, in light of the articles she wrote, is not in itself such "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155, 87 S. Ct. 1975, 18 L. Ed. 2d 1094, reh. denied, 389 U.S. 889, 88 S. Ct. 11, 19 L. Ed. 2d 197 (1967); see also *Edwards v. National Audubon Society, Inc.,* 556 F.2d 113, 120 (2d Cir. 1977) (special protection afforded to "neutral reportage").

Since a reasonable person could only view those comments as pure expressions of opinion, which are unqualifiedly protected by the first amendment under *Gertz v. Robert Welch, Inc.,* the court properly directed a verdict.[14]

---

[14] If the allegedly libelous assertions were "mixed" opinions, however, the issue is whether reasonable minds could differ as to whether they were capable of a defamatory meaning. A directed verdict is still proper in such a case unless the assertions were ambiguous, thereby rendering this an issue of fact for the jury. See *Hoover v. Peerless Publications, Inc.,* 461 F. Sup. 1206, 1209-10, (E.D. Pa. 1978).

## II

In his complaint, the plaintiff also raised one count for invasion of privacy, alleging that the defendant's publication of his financial affairs placed him in a false light before the public. The defendant claimed by way of special defense that the publications were of public interest and newsworthy and that they did not violate the plaintiff's privacy.

The right of privacy, which this court has not previously recognized,[15] has been defined as "the right to be let alone." Prosser, Torts (4th Ed. 1971) § 117, p. 802; 3 Restatement (Second), Torts § 652A, comment a; *Garner* v. *Triangle Publica-*

---

[15] Although claimed invasions of privacy were presented to us in previous cases, none of those claims was appropriate for the inquiry we undertake today. See *Prystash* v. *Best Medium Publishing Co.,* 157 Conn. 507, 511–13, 254 A.2d 872 (1969) (procedural defects prevented review of plaintiff's verdict for invasion of privacy); *Urban* v. *Hartford Gas Co.,* 139 Conn. 301, 309, 93 A.2d 292 (1952) (refusal to review demurrer where complaint alleged insufficient facts to support privacy claim). In the absence of a definitive ruling by this court, however, a number of lower state courts have recognized this cause of action in cases before them. See *Rafferty* v. *Hartford Courant Co.,* 36 Conn. Sup. 239, 416 A.2d 1215 (1980) (summary judgment denied); *Tucker* v. *Bitonti,* 34 Conn. Sup. 643, 647, 382 A.2d 841 (1977) (defendant's directed verdict); *LaFontaine* v. *Family Drug Stores, Inc.,* 33 Conn. Sup. 66, 70–73, 360 A.2d 899 (1976) (judgment notwithstanding the verdict entered for defendant); *Korn* v. *Rennison,* 21 Conn. Sup. 400, 403, 156 A.2d 476 (1959) (demurrer overruled); *Carey* v. *Statewide Finance Co.,* 3 Conn. Cir. Ct. 716, 717, 223 A.2d 405 (1966) (demurrer overruled); *Steding* v. *Battistoni,* 3 Conn. Cir. Ct. 76, 78, 208 A.2d 559 (1964) (plaintiff's judgment affirmed); see also *O'Connell* v. *Hartford Times, Inc.,* 15 Conn. Sup. 85, 86 (1947) (cause of action assumed for purposes of sustaining demurrer). This has led a number of federal courts to conclude that Connecticut recognizes a common law right of action for invasion of privacy. *Travers* v. *Paton,* 261 F. Sup. 110, 114 (D. Conn. 1966); see also *Miller* v. *News Syndicate Co.,* 445 F.2d 356, 358 (2d Cir. 1971).

*tions, Inc.,* 97 F. Sup. 546, 548 (S.D.N.Y. 1951). The origins of this right, which was not expressly recognized at common law, can be directly traced to an 1890 article written by Samuel Warren and Louis Brandeis entitled "The Right to Privacy."[16] Although the early cases were divided,[17] the right became widely accepted after it was recognized by the American Law Institute in 1938. 4 Restatement, Torts § 867. In reviewing the body of privacy law today, we note that tort actions for invasion of privacy have been judicially recognized, in one form or another, in approximately three quarters of the states.[18] 5 Restatement (Second), Torts § 652 (Appendix); 3 Dooley, op. cit., § 35.01. On the other hand, the courts which have refused to recognize this right of action have concluded that this issue was more properly one for legislative determination. *Kalian* v. *People Acting Through Community Effort, Inc.,* 408 A.2d 608, 609 (R.I. 1979); *Brunson* v. *Ranks Army Store,* 161 Neb. 519, 525, 73 N.W.2d 803 (1955). We do not agree.

There is substantive support today for the conclusion that privacy is a basic right entitled to legal protection. *Cox Broadcasting Corporation* v. *Cohn,* 420 U.S. 469, 487, 95 S. Ct. 1029, 43 L. Ed. 2d 328

---

[16] Warren & Brandeis, "The Right to Privacy," 4 Harv. L. Rev. 193 (1890).

[17] Although a right of action for invasion of privacy was rejected by the New York Court of Appeals in *Roberson* v. *Rochester Folding Box Co.,* 171 N.Y. 538, 64 N.E. 442 (1902), it was recognized three years later when the Georgia Supreme Court decided *Pavesich* v. *New England Life Ins. Co.,* 122 Ga. 190, 50 S.E. 68 (1905).

[18] In addition, four states have codified the right of privacy by statute. Three state courts, however, have expressly refused to recognize this cause of action, while the remaining states have either not decided the issue or have had their courts avoid the issue by ruling upon other grounds raised on appeal. 3 Restatement (Second), Torts § 652.

(1975); see also *Galella* v. *Onassis,* 487 F.2d 986, 995 n.12 (2d Cir. 1973). In recognizing this cause of action for invasion of privacy in Connecticut, we quote with approval the language used by the Supreme Court of Oklahoma when it recently recognized the right of privacy: "Although there was no distinctive tort of invasion of privacy in early common law, it has evolved in most jurisdictions based on common law principles sometimes compared to trespass. It is unnecessary for the Legislature to enact a law to create this tort in abrogation of the common law. The common law . . . refers not only to the ancient unwritten law of England, but also to that body of law created and preserved by decisions of courts. The common law is not static, but is a dynamic and growing thing and its rules arise from the application of reason to the changing conditions of society." *McCormack* v. *Oklahoma Publishing Co.,* 613 P.2d 737, 740 (Okla. 1980). Indeed, as the United States Supreme Court noted in *Hurtado* v. *California,* 110 U.S. 516, 530, 4 S. Ct. 111, 28 L. Ed. 232 (1884), "[t]his flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law," and this reasoning has been followed by a number of courts that have recognized the privacy right of action. See, e.g., *Birnbaum* v. *United States,* 436 F. Sup. 967, 978 (E.D.N.Y. 1977), aff'd in part, rev'd in part, 588 F.2d 319, 325 (2d Cir. 1978).

In recognizing this right of action today, we note that the law of privacy has not developed as a single tort, but as a complex of "four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right

of the plaintiff 'to be let alone.' "[19] Prosser, Torts
(4th Ed. 1971) § 117, p. 804. The four categories of
invasion of privacy are set forth in 3 Restatement
(Second), Torts § 652A as follows: (a) unreason-
able intrusion upon the seclusion of another; (b)
appropriation of the other's name or likeness; (c)
unreasonable publicity given to the other's private
life; or (d) publicity that unreasonably places the
other in a false light before the public.[20] Indeed,
these four categories have been adopted by a number
of courts that have recognized the privacy right of
action. See *Cox Broadcasting Corporation* v. *Cohn,*
supra, 493 n.22; *Corcoran* v. *Southwestern Bell Tele-
phone Co.,* 572 S.W.2d 212, 214 (Mo. App. 1978)
(noting that Restatement categories are useful, if
not critical, to privacy analysis); *McCormack* v.
*Oklahoma Publishing Co.,* supra.

---

[19] Accordingly, we join those jurisdictions that have allowed
causes of action for invasion of privacy and defamation to be
pleaded together. *Miller* v. *News Syndicate Co.,* 445 F.2d 356, 357
(2d Cir. 1971); *Varnish* v. *Best Medium Publishing Co.,* 405 F.2d
608 (2d Cir. 1968), cert. denied, 394 U.S. 987, 89 S. Ct. 1465, 22
L. Ed. 2d 762, reh. denied, 395 U.S. 930, 89 S. Ct. 1769, 23 L. Ed.
2d 251 (1969); *Rinsley* v. *Brandt,* 446 F. Sup. 850, 858 (D. Kan.
1977), and cases cited therein. This conclusion recognizes that each
action protects different interests: privacy actions involve injuries
to emotions and mental suffering, while defamation actions involve
injury to reputation. Id., quoting *Froelich* v. *Adair,* 213 Kan.
357, 516 P.2d 993 (1973). There can, of course, be only one recovery
for any particular publication. *Dodrill* v. *Arkansas Democrat Co.,*
265 Ark. 628, 638, 590 S.W.2d 840 (1979), cert. denied, 444 U.S.
1076, 100 S. Ct. 1024, 62 L. Ed. 2d 759 (1980), citing 3 Restatement
(Second), Torts § 652E, comment b, and 62 Am. Jur. 2d, Privacy § 5.

[20] Similarly, Prosser lists the four rights of privacy as (1)
"appropriation, for the defendant's benefit or advantages, of the
plaintiff's name or likeness"; (2) "intrusion upon the plaintiff's
physical solitude or seclusion"; (3) "publicity, of a highly
objectionable kind, given to private information about the plaintiff,
even though it is true and no action would lie for defamation"; and
(4) "publicity which places the plaintiff in a false light in the
public eye." Prosser, Torts (4th Ed. 1971) § 117, pp. 804–15;
Prosser, "Privacy," 48 Cal. L. Rev. 383 (1960). -

Count three of the plaintiff's complaint raises a claim for publicity which unreasonably placed him in a false light before the public. To the extent that freedom of the press is involved in this claim, federal law is relevant. *Varnish* v. *Best Medium Publishing Co.*, 405 F.2d 608, 611 n.3 (2d Cir. 1968), cert. denied, 394 U.S. 987, 89 S. Ct. 1465, 22 L. Ed. 2d 762, reh. denied, 395 U.S. 930, 89 S. Ct. 1769, 23 L. Ed. 2d 251 (1969). The United States Supreme Court first considered the parameters of false light invasions of privacy in *Time, Inc.* v. *Hill,* 385 U.S. 374, 87 S. Ct. 534, 17 L. Ed. 2d 456 (1967). In construing New York's statutory right of privacy against the requirements of the first amendment,[21] the court held that the "actual malice" standard of *New York Times Co.* v. *Sullivan* was applicable to privacy actions. "We hold that the constitutional protections for speech and press preclude the application of the . . . statute to redress false reports of matters of *public interest* in the absence of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth." (Emphasis added.) Id., 387–88; see also annot., 57 A.L.R.3d 16. Thus, matters of public interest were considered newsworthy and a media defendant could not be found liable for a false light invasion of privacy of a private person resulting from erroneous statements that were innocently or even negligently made. *Time, Inc.* v. *Hill,* supra, 388. The court noted, however, that "[t]his limitation to *newsworthy* persons and events does not of course foreclose an interpretation . . . to allow

---

[21] Although this statute prohibited the *appropriation* of another's name or likeness, the case was analyzed as a false light action. *Cantrell* v. *Forest City Publishing Co.,* 419 U.S. 245, 249, 95 S. Ct. 465, 42 L. Ed. 2d 419 (1974).

damages where '[r]evelations may be so intimate and so unwarranted in view of the victim's position as to outrage the community's notions of decency.' " (Emphasis added.) Id., 383 n.7.

The rule announced in *Time, Inc.* v. *Hill* was followed in the next false light case before the court, *Cantrell* v. *Forest City Publishing Co.*, 419 U.S. 245, 249, 95 S. Ct. 465, 42 L. Ed. 2d 419 (1974). Because *Cantrell* was decided after *Gertz*, it raised the question of whether a state may constitutionally apply a more relaxed standard of liability than "actual malice" to media defendants against claims of private persons for false light invasions of privacy. *Cantrell* v. *Forest City Publishing Co.*, supra, 250-51. Since the court had no occasion to consider this issue under the facts presented, the actual malice standard still applied under the public interest analysis announced in *Hill*, despite the rejection of this principle in the libel area.[22] *Gertz* v. *Robert Welch, Inc.*, supra, 346 (rejecting public interest test of *Rosenbloom* v. *Metromedia, Inc.*, 403 U.S. 29, 91 S. Ct. 1811, 29 L. Ed. 2d 296 [1971] [plurality opinion], for determining applicability of actual malice standard to private defamation

---

[22] One lower federal court has held, however, that because of the strong similarity between a false light claim and a defamation claim, the *Gertz* rule regarding the status of the plaintiff will replace the *Hill* rule regarding the public interest of the publication in the area of false light privacy. *Rinsley* v. *Brandt*, 446 F. Sup. 850, 856 (D. Kan. 1977). We refuse to take this step until the rule in *Hill* has been expressly modified or overruled. Accord *Dodrill* v. *Arkansas Democrat Co.*, 265 Ark. 628, 639n, 590 S.W.2d 840 (1979), cert. denied, 444 U.S. 1076, 100 S. Ct. 1024, 62 L. Ed. 2d 759 (1980); see also Lehmann, "Triangulating the Limits on the Tort of Invasion of Privacy: The Development of the Remedy in Light of the Expansion of Constitutional Privilege," 3 Hastings Const. L.Q. 543, 594 (1976); Greenwood, "Privacy: The Search for a Standard," 11 Wake Forest L. Rev. 664 (1975).

actions); see also *Cox Broadcasting Corporation v. Cohn,* 420 U.S. 469, 498 n.2, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975) (Powell, J., concurring).

A number of state and federal courts have applied the Restatement rule that a false light invasion of privacy occurs if "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." 3 Restatement (Second), Torts § 652E; see *Varnish v. Best Medium Publishing Co.,* supra; *Logan v. District of Columbia,* 447 F. Sup. 1328, 1333 (D.D.C. 1978); *Dodrill v. Arkansas Democrat Co.,* 265 Ark. 628, 590 S.W.2d 840 (1979), cert. denied, 444 U.S. 1076, 100 S. Ct. 1024, 62 L. Ed. 2d 759 (1980); *Harrison v. Washington Post Co.,* 391 A.2d 781, 784 (D.C. App. 1978); *McCormack v. Oklahoma Publishing Co.,* supra. This form of invasion of privacy protects one's interest in not being placed before the public in an objectionable false light or false position, "or in other words, otherwise than as he is." 3 Restatement (Second), Torts § 652E, comment b. The essence of a false light privacy claim is that the matter published concerning the plaintiff (1) is not true; ibid; and (2) is such a "major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position." Id., comment c.

Applying these standards to the present case, we note that the plaintiff conceded during direct examination that the published statements concerning his financial affairs were true, and this defeats his

claim for a false light invasion of privacy. Nor can he recover for the claim made in count three of the complaint that "[d]espite the truth of such statements there exist additional circumstances which when expanded, cast the plaintiff in a *more favorable light* more in keeping with reality." (Emphasis added.) To allow recovery upon such a claim would violate the defendant's first amendment rights, since "[t]he choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials–whether fair or unfair–constitute the exercise of editorial control and judgment." *Miami Herald Publishing Co.* v. *Tornillo,* 418 U.S. 241, 258, 94 S. Ct. 2831, 41 L. Ed. 2d 730 (1974) ; see also *Virgil* v. *Time, Inc.,* 527 F.2d 1122, 1129 (9th Cir. 1975) ("private facts" privacy case). Under the first amendment, a media defendant can be liable for a false light invasion of privacy only where it publishes highly offensive material without regard to its falsity, and to the false impression relayed to the public. *McCormack* v. *Oklahoma Publishing Co.,* supra. As long as the matter published is substantially true, the defendant was constitutionally protected from liability for a false light invasion of privacy, regardless of its decision to omit facts that may place the plaintiff under less harsh public scrutiny.

Finally, although the complaint appears to allege only a false light invasion of privacy claim, to the extent that the publications involved matters of public interest, this claim overlaps that for unreasonable publicity given to one's private life. 3 Restatement (Second), Torts § 652D. This claim is also governed by first amendment principles. *Cox*

*Broadcasting Corporation* v. *Cohn,* supra, 493–94. Such a "private facts" claim is actionable only if the matter publicized is of a kind that "(a) would be highly offensive to a reasonable person, and (b) is not of *legitimate concern* to the public." (Emphasis added.) 3 Restatement (Second), Torts § 652D, p. 383. A media defendant is constitutionally permitted to publicize facts concerning an individual's private life so long as those facts are newsworthy; *Virgil* v. *Time, Inc.,* 527 F.2d 1122, 1128–29 (9th Cir. 1975); and in conducting this inquiry we consider "[1] the social value of the facts published, [2] the depth of the article's intrusion into ostensibly private affairs, and [3] the extent to which the party voluntarily acceded to a position of public notoriety." *Briscoe* v. *Reader's Digest Assn., Inc.,* 4 Cal. 3d 529, 541, 483 P.2d 34 (1971), quoting *Kapellas* v. *Kofman,* 1 Cal. 3d 20, 36, 459 P.2d 912 (1969).

Applying these principles here, we note that the construction of the Hamlet was clearly a matter of legitimate interest to the community. The articles published financial facts that were relevant to the completion of the mall, and did not intrude into his otherwise private affairs. Lastly, the plaintiff voluntarily injected himself into the public eye by engaging in an enterprise which affected the public welfare. Indeed, "[i]t is not necessary that persons actively seek publicity in order to be found in the 'public eye.'" *Adreani* v. *Hansen,* 80 Ill. App. 3d 726, 730, 400 N.E.2d 679 (1980) (publicity about condemnation proceedings brought against builders did not constitute false light invasion of privacy where proposed use of the real estate was a matter of public interest). Accordingly, the right of privacy must give way when balanced against the pub-

lication of matters of public interest, in order to insure the "uninhibited, robust and wide-open" discussion of legitimate public issues. *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

We hold that the right to publicize newsworthy matters would, as a matter of law, extend to the general subject of these articles and that reasonable minds could not differ that the specific financial facts published were also newsworthy. *Virgil* v. *Time, Inc.,* supra, 1131. Furthermore, the articles here merely published information about the plaintiff's finances that were already matters of public record, such as liens and lawsuits filed against him, and this fact defeats the claim that his privacy was invaded by their publication. *Cox Broadcasting Corporation* v. *Cohn,* supra, 494–95. Accordingly, the trial court did not err in directing a verdict as to this count.

There is no error.

In this opinion the other judges concurred.

## APPENDIX A

The November 8, 1974 article was printed under the headline *"Legal Action Threatened: Developer Told To Complete Work,"* and is set out below with italics designating the allegedly libelous assertions.

"MIDDLEBURY–Legal action may face the developer of the Middlebury Hamlet if he does not complete work to prevent erosion and sedimentation problems in the Fenn's Pond area.

"The Planning and Zoning Commission voted Thursday night to order Harold K. Goodrich, hamlet developer, to complete the work before Dec. 5 on the brook area which abuts the Hamlet.

"The commissioners also agreed that they would probably take legal action against Goodrich if he doesn't complete the work.

"On a recommendation from Frank E. Endorf Jr., district conservationist from the U.S. Department of Agriculture, Goodrich must enlarge a silt trap and add a filter dike; supply runoff computations; rip-rap the parking lot runoff and roof runoff outlet areas; and enlarge and line with stone the drainage ways leading to the silt trap.

"In a letter dated Oct. 1, Endorf also recommended that the exposed brook banks be graded and seeded down by Oct. 15.

"Endorf told the commission that it was too late to seed the area, but Comsr. James Kennerly said, 'There's no reason why he can't clear out the settling tank and do the rip-rapping along the water course.'

"The commission gave Goodrich until May 15 to do the seeding work, and said they would advise him by registered mail of the decision.

"Under another Endorf recommendation, Goodrich must request permission from the Department of Environmental Protection to install water diversions above the exposed bank behind the building.

"Since Goodrich has two alternative means of doing his work, the commission voted to have him reply in writing by their next meeting on how he will handle this work.

*"The run-off from the hamlet has long been a sore spot with both the Planning and Conservation commissions, since Goodrich was to have completed all the soil erosion work several months ago.*

"Edward Jones of the Middlebury Land Conservation Association told the commission that Fenn's

Pond 'is in danger of becoming a mudflat' because of siltation caused by drainage systems at the Hamlet.

" 'Heavy rainfalls create havoc at this pond,' he said. 'I don't know who's responsible, but it seems in the last few months various town agencies have been pointing their fingers at each other.'

"Endorf said he had gone over his recommendations with Goodrich, 'and he seemed almost agreeable to anything at the time.'

"The conservationist said that Goodrich had indicated he had a consulting engineer. The commissioners also agreed that Goodrich supply a report from the engineer on how the drainage problem could be handled."

## APPENDIX B

The November 10, 1974 article was printed under the headline *"Off Route 64: Troubles Beset Middlebury Shopping Center,"* and is set out below with italics designating the allegedly libelous assertions.

"MIDDLEBURY–*A near ghost-town of a shopping center on Route 64 is up to its rooftop in troubles.*

*"On the surface, the Middlebury Hamlet is an attractive colonial-type shopping complex, located about two miles from the Four Corners business district.*

*"But behind the pretty exterior lies a host of traffic, conservation and financial worries for the Hamlet's developer and town officials.*

*"Harold K. Goodrich, owner and developer, faces close to $100,000 in liens and lawsuits against the property, and possibly another lawsuit from the town's Planning and Zoning Commission.*

"Besides the suits and liens, *the Hamlet,* open for business since early spring, *is still a mere shell of a shopping area,* with several vacant storefronts and a string of empty office spaces.

"Goodrich's problems are multiple, but the major setbacks to the Hamlet have been a drainage system that is triggering siltation in Fenn's Pond, and a Planning and Zoning Commission which has refused applications to allow a liquor store and sandwich shop at the complex, thus leaving two open storefronts.

"The planners, too, are in a hot water bath of their own.

"Almost 15 months ago, Goodrich agreed to install a settling pond, and drainage system, and seed the bank above the brook to prevent erosion and sedimentation from the Hamlet's parking lot into the brook that abuts the property.

"Included in the agreement was a $10,000 performance bond to the town which Goodrich posted for the work.

"The bond expired May 22, but the commission never called it, although it knew at the time that most of the work on the brook area had not been completed.

"Now, the commission is saddled with complaints from local conservationists that run-off from the Hamlet is turning Fenn's Pond into 'a mudflat.' And they're demanding speedy action from both the commission and the developer.

"Comsr. Curtis Titus said the commission did call the bond, but did so after it expired. Titus con-

ceded that the town may not have any recourse, as far as the bond is concerned, but still has the option of hiring a contractor to complete the drainage work and sue Goodrich for the costs.

"According to Titus, the Western Surety Co. of South Dakota informed that commission that Goodrich's bond was to expire June 6, 'so we voted to call the bond June 5 if the work was still incomplete. When we wrote to the bonding company, they informed us that the bond they referred to was one regarding another matter,' Titus said. 'By then, Goodrich's bond on the drainage work had expired, and there we were.'

"In May, Goodrich said he would ask for an extension on the bond, but Comsr. James Kennerly said that, as far as he knew, 'he never asked for a renewal or an extension.'

"At several meetings following the bond's expiration, the planners have argued, set deadlines and talked endlessly with Goodrich about the problem. Mix-ups and misplaced letters further complicated the commission's apparent drive to get the matter cleared up.

"Goodrich has claimed that the drainage system is just about complete, but continued erosion and sedimentation into the brook has so unnerved both the planning and Conservation Commissions that neither one is willing to look beyond the silt.

"A soil conservationist from the U.S. Department of Agriculture had been called in on the problem, and had made six recommendations. Last week the planners gave Goodrich until Dec. 5 to comply with four of them, or possibly face court action.

*"Traffic problems, too, plague the Hamlet.* A number of residents have commented that the development is in a badly situated spot on heavily traveled Route 64, and drivers going the maximum speed limit ride by the Hamlet without ever realizing it's there.

"Police Commissioners and the police chief have asked the planning commission to look into the traffic problem, while a letter from the Traffic Commission warned the planners that the development is in violation of a state statute because of the way the exit and entrance are situated.

"Siltation of Fenn's Pond and three aggravated commissions are only one-half of the entire problem.

*"A plumbing and heating firm, a lumber company, and a paving company have filed a total of $60,486 in liens against the Hamlet developer. And a $30,000 suit was filed against Goodrich for failure to pay a brokerage commission on the Hamlet's mortgage financing.*

"On top of that, Goodrich is finding it difficult to attract tenants, particularly for the development's second story offices. To date, only one firm has rented an office, while the remainder of the sizeable space is going unused.

"According to the developer's son, Kenneth Goodrich, the vacant stores on the ground floor are the fault of the planners.

" 'First they turned down an application for a liquor store, then another for an ice cream and sandwich shop,' he said. 'They base their decisions on whether the town needs these stores, but they're not there to decide whether the town calls for a given store.

" 'If they keep turning us down, we can start talking a hardship case,' he said. 'The zoning board seems to think that they're the Supreme Court.'

"According to the younger Goodrich, his father has been agreeable to all the town's demands, 'but it takes time to get the job completely done. I don't know what they expect.'

"Eventually a supermarket chain store will move into the Hamlet, he said, adding that the would-be liquor store owner is still paying rent for a space he cannot occupy.

"Mrs. Bernice Boyd, former chairman of the Conservation Commission, says the major problem is non-enforcement of town ordinances.

" 'Had the laws been enforced' at the Hamlet, she said, 'none of this would have happened.'

"The town, she said, enacted 'good ordinances and regulations which were approved by the town to protect townspeople's interest.'

"Mrs. Boyd cited both the excavation and land-fill regulations, which, she said, 'are not being enforced. And members of the town commissions are not enforcement officers.'

"And unless the laws are enforced, 'they serve no useful purpose,' she said. The town should have a 'qualified authority empowered to enforce these laws where violations exist,' Mrs. Boyd said.

" 'The regulations are the results of eight year's work of the commission,' she added. 'Since we've had two different administrations, it's not the fault of either party. It's just a lack of following-through.' "