**JIM HENSON PRODUCTIONS, INC., Jane Henson, and Albert Gottesman and Karen Barnes as Executors of the Estate of Jim Henson, Plaintiffs,**

v.

**JOHN T. BRADY & ASSOCIATES, INC., and Wilkins Coffee, Inc., Defendants.**

**No. 92 Civ. 5115 (LAP).**

United States District Court, S.D. New York.

Oct. 21, 1994.

■

Carol Simkin, Weiss, Dawid Fross Zelnick & Lehrman, P.C., New York City, for Jim Henson Productions, Inc., Jane Henson, Albert Gottesman, Karen Barnes, as Executors of the Estate of Jim Henson.

Peter D. Raymond, Hall, Dickler, Lawler, Kent & Friedman, New York City, for John T. Brady & Associates, Inc., Wilkins Coffee, Inc.

## OPINION AND ORDER

PRESKA, District Judge.

This dispute centers around the ownership of a pair of characters named "Wilkins" and "Wontkins" and their possible status as members of the family of puppets created by Jim and Jane Henson and commonly known as "The Muppets." Currently before me are the parties' cross-motions for summary judgment.

### Background

While students at the University of Maryland in the 1950s, Jim and Jane Henson began work on what would become a puppet-based entertainment empire. Commencing sometime about 1954, they adopted the term "Muppet" as a service mark and as a trademark to identify the characters they created and performed. In the years following, the Hensons developed the Muppet mark, as well as the Henson mark, into symbols recognized around the world as representing the Hensons' unique brand of entertainment. The Muppet and Henson marks are currently owned by Jim Henson Productions, Inc. ("Henson Productions"), a plaintiff in this action. As always, the Muppets are performed only by Henson Productions-trained puppeteers, and licensing of the Muppet and Henson marks is tightly controlled to maintain their reputation for quality.

In 1957 or 1958, the Hensons created two puppet characters named Wilkins and Wontkins ("W & W"). W & W were employed at the time by the John H. Wilkins Company (J.H. Wilkins) as "spokespuppets" in a Washington, D.C. advertising campaign for its coffee products. As part of the campaign, the Hensons produced and performed a series of television commercials starring W & W, which ran throughout the late 1950s and early 1960s. Additionally, the characters were featured in print and newspaper advertising. W & W never appeared on containers of J.H. Wilkins' coffee products, except that during the running of the television ads, they were depicted on coffee can lids in connection

with an offer to sell soft vinyl W & W miniatures described as "Wilkins Hand Muppets." J.H. Wilkins never attempted to register the characters as trademarks, and in the mid–1960s, the W & W campaign was discontinued.

Soon after J.W. Wilkins began using W & W, the company and the Hensons entered into a pair of agreements concerning rights in the characters. On September 16, 1958, the parties executed an Assignment Agreement, wherein the Hensons transferred to J.H. Wilkins, and its successors and assigns, *inter alia*,

> the entire right, title and interest in and to [W & W] and to any and all copyright(s), trademark(s) or trademark registration(s), Letters Patent and patent applications, United States or foreign, which may be obtained for and on [W & W] or any part, embodiment, use or adaptation thereof of any nature, without any limitation or reservation whatever.

Subsequently, on October 16, 1958, the Hensons executed a separate assignment to J.H. Wilkins of their entire right, title, and interest in and to their designs for W & W dolls, puppets, or the like, and their application for Letters Patent and any and all Letters Patent or Patents which might be granted thereon and any and all continuations, reissues, or extensions thereof.[1]

In mid–1974, there began a series of transactions whereby the rights transferred in the 1958 agreements allegedly fell into the hands of one of the present defendants, Wilkins Coffee, Inc. ("Wilkins"). At that time, J.H. Wilkins sold substantially all of its assets to Ziko, Inc., a division of Halco Products Corporation. Ziko, Inc., in turn, sold substantially all of its assets to the Wilkins Corporation in April, 1984. The Wilkins Corporation, in 1984, was merged into Wilkins Coffee Service, Inc., and in 1987, Wilkins Coffee Service, Inc. sold substantially all of its assets to Seymour S. Abensohn. Finally, that same year, Abensohn assigned the assets to Wilkins.

During the 1980s and 1990s, Wilkins and its predecessor, Wilkins Coffee Service, Inc., revived W & W and employed them as promotional aids in a variety of settings. Wilkins broadcast several television commercials featuring W & W and incorporating clips from the original J.H. Wilkins spots. In addition, Wilkins placed W & W on its coffee can lids, in newspaper advertisements, and on T-shirts, coupons, and free-standing display cases in stores. Wilkins obtained trademark registrations on the characters on October 8, 1991.

Aside from using the characters themselves, Wilkins and Wilkins Coffee Service, Inc., on numerous occasions during the 1980s, licensed W & W to other parties, including the plaintiffs, for use in television programs. Apparently hoping to develop more opportunities of this type, Wilkins, in early 1991, executed an agreement with defendant John T. Brady & Associates, Inc. ("Brady") giving that company the exclusive right to market and license W & W. With Wilkins' cooperation, Brady launched a plan to market W & W as Muppets and license them as trademarks. Brady's materials promoting this program describe W & W as "Original Muppets Created by Jim Henson" and feature several photographs of Jim Henson performing the characters. Henson's name is sprinkled liberally throughout the text.

Soon after the plaintiffs became aware of the Wilkins–Brady agreement, they filed applications for copyrights on W & W and brought the instant suit. The plaintiffs claim that the defendants' past activities and future plans constitute infringement of the Muppet and Henson trademarks, infringement of their copyrights in W & W, infringement of the Hensons' respective rights to publicity, unfair competition under both New York and federal law, and breach of the 1958 agreements. Additionally, the plaintiffs ask for a declaratory judgment that the defendants have not succeeded to the rights conveyed to J.H. Wilkins under the 1958 agreements. The defendants, for their part, deny all of the

---

**1.** The parties disagree as to the scope of the rights conveyed in the 1958 agreements. In view of my ruling below, however, it is not necessary to resolve that question.

plaintiffs' claims and assert several of their own.

Presently before me are the parties' cross-motions for summary judgment. The plaintiffs move for summary judgment granting their declaratory judgment claim, while the defendants seek dismissal of that claim and all others.

## Discussion

### I. Standard for Summary Judgment

Rule 56(c) provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Richardson v. Selsky*, 5 F.3d 616, 620 (2d Cir.1993). The substantive law identifies the facts which are material. *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

The party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotext Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Upon the movant's satisfying that burden, the onus then shifts to the nonmoving party to " 'set forth specific facts showing that there is a genuine issue for trial.' " *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511 (quoting Fed.R.Civ.P. 56(e)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). However, the nonmoving party is entitled to have all inferences and ambiguities resolved in its favor. *Gladstone v. Fireman's Fund Ins. Co.*, 536 F.2d 1403, 1406 (2d Cir.1976). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York*, 957 F.2d 961, 975 (2d Cir.1992).

### II. The Declaratory Judgment Claim

The defendants claim to be the successors-in-interest to rights in W & W assigned by the plaintiffs to J.H. Wilkins in 1958. They assert these rights as a basis for their alleged entitlement to employ and license W & W. The plaintiffs, on the other hand, seek a declaratory judgment that such is not the case.

As an initial argument against summary judgment on this claim, the defendants contend that the plaintiffs are equitably estopped from denying their rights in W & W on account of the Hensons' relinquishment of rights in the 1958 agreements. In order to prove estoppel, a party must show that it actually and reasonably relied to its detriment on the other party's misrepresentation or concealment of a material fact. *See U.S. West Financial Services, Inc. v. Tollman*, 786 F.Supp. 333 (S.D.N.Y.1992); *Bernstein v. Centaur Insurance Co.*, 644 F.Supp. 1361 (S.D.N.Y.1986).

I am hard pressed to discern the misrepresentation or concealment upon which the defendants claim to have relied. They assert that they

> had every reason to believe that Jim and Jane Henson and their company understood and agreed that Wilkins Coffee and its predecessors-in-interest owned all rights to Wilkins and Wontkins and that the Hensons would not interfere with their use of Wilkins and Wontkins.

Def.Opp.Mem. at 23. It is not clear, however, how the plaintiffs are responsible for giving rise to that belief. There is no allegation that the Hensons ever affirmatively said to Wilkins or any other party anything to the effect that they understood Wilkins to own the characters. Apparently, Wilkins reads the 1958 assignments as representations by the Hensons that they no longer claimed any interest in W & W, and, on the basis of the plaintiffs' actions in prosecuting this suit thirty years later, argues that those representations were false and misleading when made.

Accepting this by no means obvious rationale, there are still problems with the estoppel claim. First, there is the question of the defendants' actual reliance. As the plaintiffs accurately note, the defendants have proffered no evidence that they were even aware of the 1958 assignments when they began using W & W, much less that they relied on those documents. During discovery, the plaintiffs' document requests demanded any copies of the 1958 agreements between the Hensons and J.H. Wilkins in Wilkins' possession or control. In response, the defendants produced one copy of the October 16, 1958 patent assignment. *See* Pearson 9/10/93 Aff. at ¶¶ 21–22. The patents covered by that assignment had expired in 1973, however, and even assuming that the defendants had the document prior to beginning their use of W & W in 1988, it could not reasonably have been the basis for an inference that the Hensons had given up all right, title, and interest of whatever kind in W & W.

Second, and just as damaging to the defendants, even if they could establish reliance, their estoppel claim would still lack merit because of their failure to prove any resulting detriment. *See Philanz Oldsmobile, Inc. v. Keating*, 51 A.D.2d 437, 381 N.Y.S.2d 916 (4th Dept.1976) (noting reliance as element of estoppel claim). On this point, the defendants simply argue that prejudice may be presumed from their use of W & W in various advertising media to build consumer awareness and identification with Wilkins' products. The logic is not so obvious to me.

If defendants had demonstrated that W & W had become synonymous with Wilkins in the public eye so that loss of the characters would adversely affect sales and require them to redesign their whole marketing strategy, detriment would be clear. The record, however, contains no evidence tending to establish the existence of such a scenario. In

fact, the principal of Wilkins' advertising agency testified that Wilkins has been *reducing* its use of W & W for more than a year. *See* Pearson 9/10/93 Aff. at ¶ 17. *See Cullman Ventures, Inc. v. Columbian Artworks, Inc.*, 717 F.Supp. 96, 135 n. 31 (S.D.N.Y.1989) (estoppel defense not viable where defendant failed to show it had built up goodwill in its purported mark or that an injunction would be prejudicial). Defendants' motivation in pursuing this litigation is not to protect W & W as symbols of Wilkins' goodwill. Quite the opposite, they seek to protect their rights to license the characters for independent use by others.[2] *See* Def.Ex. 66.

Because the defendants have failed to raise issues of fact as to reliance or detriment, their estoppel claim fails, and I will go on to consider the plaintiffs' arguments in favor of summary judgment.

■ The basis of the plaintiffs' position that Wilkins is not the successor to J.H. Wilkins' rights under the 1958 agreements is that there are allegedly breaks in the chain of title by which Wilkins claims successor-in-interest status. The first break the plaintiffs claim to expose is said to exist in the chain's first link, the Asset Purchase Agreement between J.H. Wilkins and Ziko, Inc., executed in August, 1974.

Section 1.01(a) of that agreement provides that the property conveyed consisted of:

> all the goodwill, business as a going concern, properties and assets of the [J.H. Willkins Coffee] Division, of every kind, nature and description, real, personal or mixed, tangible or intangible, wherever situated ...

According to the defendants, the clear language of this clause demonstrates that the J.H. Wilkins–Ziko, Inc. transaction included

---

**2.** Alternatively, the defendants might prove detriment by showing they have developed a plan for the future use of W & W, the scuttling of which will somehow cause them great injury. The meat of this case, in fact, is the plaintiffs' opposition to announced plans by the defendants to begin widespread licensing and exploitation of the characters. Defendants themselves, however, acknowledge that those plans are still in their formative stages. No binding commitments or agreements with third parties have been executed. *See* Pearson 9/10/93 Aff. at ¶ 15. Consequently, there is no basis for me to conclude that the defendants will be harmed if their plans are denied fruition. *See Securities Settlement Corp. v. Jachera*, 772 F.Supp. 770 (S.D.N.Y.1991) (change of position, as element of estoppel claim, is established only if change is irrevocable or status quo cannot be restored without expense).

the rights in W & W conveyed to J.H. Wilkins by the Hensons in 1958.

The plaintiffs argue that Section 1.01(a) is governed by another section of the Agreement, 3.12, which declares that:

[T]he [attached] Disclosure Schedule contains an accurate and complete description of all patents, trademarks, trade names, assumed names and copyrights, and all applications therefor, presently owned or held by Wilkins, under which Wilkins owns or holds any license or in which Wilkins owns or holds any interest.

Looking to the Disclosure Schedule, there is *no mention of any rights in W & W*. The plaintiffs contend, therefore, that no such rights were transferred to Ziko, Inc. or, down the line, to Wilkins.

In asserting that Section 3.12's enumeration of assets takes precedence over the general language of Section 1.01(a), the plaintiffs stand on the venerable principle of contract law which provides that "where the parties have particularized the terms of a contract an apparently inconsistent general statement to a different effect must yield." *Preminger v. Columbia Pictures Corp.*, 49 Misc.2d 363, 267 N.Y.S.2d 594, 599 (N.Y.Sup. Ct.), *aff'd*, 25 A.D.2d 830, 269 N.Y.S.2d 913 (1st Dept.1966) (internal citation omitted).[3]

The flaw in this position is that Sections 1.01(a) and 3.12 are not inconsistent. Section 1.01, entitled "Assets to be Sold," is placed in the Agreement under the heading "Sale of Assets." Clearly, its purpose is to define those assets included in the sale transaction, which by its terms are all the assets of the J.H. Wilkins Coffee Division.

Section 3.12, entitled "Patents, Trade Marks, Trade Names, Etc.," is placed under the heading "Representations and Warranties by Wilkins." As indicated by the heading, *the purpose of the section is to make certain warranties to the buyer*, including, by the terms of Section 3.12, a warranty that J.H. Wilkins owned free and clear the pat-

ents, trade marks, trade names, etc., listed in the schedule referenced therein.

As a warranty, Section 3.12 does not contribute to defining the subject matter of the sale. Accepting the plaintiffs' argument that Section 3.12 makes no mention of rights in W & W, this merely means that no warranties were made by J.H. Wilkins with respect to those rights (fortuitously, as it turns out, for J.H. Wilkins). It does not mean that those rights were not conveyed. On the contrary, the all-inclusive terms of Section 1.01 make clear that whatever rights J.H. Wilkins possessed were sold to Ziko, Inc. Accordingly, the challenge to Wilkins' chain of title on the basis of this Agreement must be rejected.[4]

■ The plaintiffs claim another broken link in the chain of title at the June, 1987 Asset Purchase Agreement between Wilkins Coffee Service, Inc. and Seymour Abensohn. The plaintiffs claim that this assignment did not transfer any rights in W & W, except as trademarks and tradenames. According to the defendants, the transaction included all of the tangible and intangible assets of Wilkins Coffee Service, Inc., including the full panoply of intellectual property rights in W & W.

The 1987 Agreement is clear in its application to trademark and tradename rights in W & W. Other rights in the characters are not specifically treated. The defendants rely upon the second "Whereas" clause of the Agreement, which declares "other tangible and intangible assets" to be among "additional assets" covered by the transaction, to support their contention that the remaining rights were conveyed.

Further down in the Agreement, however, in the section titled "Purchase Price and Payment," the "additional assets" are valued at $400,000, and the reader is referred to "Exhibit A–5" for an allocation of that price among specific assets. Turning to Exhibit A–5, one finds a reference to trademarks and

---

**3.** Section 10.08 of the Asset Purchase Agreement provides that the Agreement will be governed by New York law.

**4.** The plaintiffs also attempt to challenge this link in the chain of title with testimony from the attorneys who negotiated the Agreement that the

parties did not intend rights in W & W to be included in the conveyance. *See* Simkin 7/30/93 Aff at ¶ 44. However, this testimony is not uncontradicted. *See* Def.Ex. 5 at 85. Consequently, it cannot be a basis for summary judgement.

tradenames but no mention of any other rights relating to W & W.[5] One of two results must therefore obtain: no other rights in W & W were assigned, or no consideration was paid for such rights. In either case, no valid transfer of rights in W & W, beyond trademark rights, was effected. *See Benet v. Berkey,* 57 N.Y.S.2d 329 (N.Y.Sup. Ct.1945) (contract not supported by consideration invalid). Consequently, the chain of title was broken, except with respect to possible trademark rights, and Wilkins, as assignee of Abensohn, did not succeed to anything beyond that. *See Rainbow Ranch Corp. v. Rainbow Shops Inc.,* 89 Misc.2d 808, 392 N.Y.S.2d 796 (N.Y.Sup.Ct.1977) (assignee never stands in any better position than his assignor).[6]

■ As concerns the trademark rights, the plaintiffs deny defendants' status as successors-in-interest on the ground that none of the trademark rights have survived to the present day. The plaintiffs claim that J.H. Wilkins never developed trademark rights in W & W and, alternatively, that even if such rights had been developed, they were abandoned by J.H. Wilkins' failure to use W & W during the late 1960s and early 1970s.

The defendants do not deny the assertion that J.H. Wilkins either never had or abandoned trademark rights in W & W.[7] Instead, the defendants argue that what J.H. Wilkins received from Henson, and what they have succeeded to, was not existing trademark rights but rather an exclusive

right to obtain trademarks in W & W that has survived to the present day.

■ The problem with this claim is that there is no such animal as an independent, freely-transferable right to obtain a trademark. A fundamental principle of trademark law is that trademark rights arise solely from use of a mark in commerce to represent the goodwill of an on going business. *See Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916); *Berni v. International Gourmet Restaurants of America, Inc.,* 838 F.2d 642 (2d Cir.1988); 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 16.01, 16.03, 19.01[1] (1992) (*"McCarthy"*). This concept is reflected in caselaw and in the Lanham Act, which makes current use a prerequisite to the registration of a trademark and provides that cessation of use results in forfeiture of trademark rights. *See* 15 U.S.C. § 1051, 1064, 1127 (West Supp. 1993); *Stetson v. Howard D. Wolf & Associates,* 955 F.2d 847, 851 (2d Cir.1992); *Silverman v. CBS, Inc.,* 870 F.2d 40 (2d Cir.), *cert. denied,* 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989). Accordingly, to the extent there exists any such thing as a right to obtain a trademark, it is only as a byproduct of contemporaneous use, and it survives only so long as use continues. One who has developed such a right may, of course, sell it. *See* 1 *McCarthy* § 18.01[1]. However, in effect, such a transaction merely gives the purchaser the right to continue using the mark so as to maintain its trademark-

---

5. Exhibit E to the Agreement lists "Wilkins" and "Wontkins," and "the puppet figures or drawings" known by those names as among the trademarks and tradenames assigned to Abensohn.

6. A Supplemental Assignment and Bill of Sale was later executed by Wilkins Coffee Service, Inc. wherein all right title and interest in W & W as trademarks and tradenames was conveyed to Wilkins Coffee, Inc., the successor of Seymour Abensohn. This agreement merely clarified the first assignment between Wilkins Coffee Service, Inc. and Abensohn; nothing additional was conveyed. Moreover, there is a substantial likelihood that the Supplemental Assignment is null and void insofar as it was executed after Wilkins Coffee Service, Inc. had been dissolved and the signing officer did not have continuing authority

to execute documents on its behalf. *See* Pearson 8/20/94 Aff. at ¶ 42(d).

7. The defendants admit that "[i]t is not clear from the record whether the various uses which the John H. Wilkins Company made of Wilkins and Wontkins ... constituted a trademark use." Def.Opp.Mem. at 6. What is clear is the uncontradicted testimony of J.H. Wilkins officials that the company retired the characters, without any intent to reactivate them, approximately 10 years before selling them to Halco Products Corporation. *See* Simkin 7/30/93 Aff., ¶ 25–26. Such an extended cessation of use creates a presumption, here unrebutted, that any trademark rights J.H. Wilkins might have previously developed were abandoned and forfeited. *See* 15 U.S.C. § 1127; *Silverman v. CBS, Inc.,* 870 F.2d 40, 45 (2d Cir.), *cert. denied,* 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989).

eligible status. And where the seller has not used the mark so as to invest it with trademark-eligible status, the purchaser does not get even that.

Returning to the matter at hand, J.H. Wilkins did not receive a right to obtain trademarks in W & W under the 1958 agreements. Prior to the transactions, the Hensons had not used the characters to symbolize any goodwill, so they had no right to obtain trademarks in them to convey.[8] Moreover, even if the Hensons did have such a right, and assuming they conveyed it to J.H. Wilkins, it expired due to J.H. Wilkins' extended cessation of use of the characters. *See infra,* at 183 n. 8. What J.H. Wilkins did receive from the Hensons (construing the disputed facts in favor of the defendants) were other rights in W & W which enabled it to use the characters in commerce and thereby develop its own trademark rights in the characters. These other rights of use were not trademark rights, though. Consequently, like the other non-trademark rights under the 1958 agreements, they do not belong to Wilkins because of the break in the chain of title discussed above.

In sum, Wilkins did not succeed to any rights in W & W granted to J.H. Wilkins by the Hensons in the 1958 agreements. The conveyance from Wilkins Coffee Service, Inc. to Seymour Abensohn included only trademark rights in the characters; and Wilkins, as Abensohn's assignee, could not have received anything more. The trademark rights were a nullity by the time they reached Wilkins, because J.H. Wilkins' failure to use W & W as trademarks in the 1960s and 1970s resulted in their abandonment. The whole of the matter is that Wilkins has succeeded to no living rights. Therefore, the plaintiffs'

motion for summary judgment on their claim for declaratory relief is granted.

## III. The Copyright Claim

■ The defendants move for summary judgment dismissing the plaintiffs' copyright infringement claim and granting the defendants' related counterclaim[9] on the grounds that the copyrights in W & W have fallen into the public domain. In their supporting papers, they have advanced two rationales purporting to lead to that conclusion, both of which depart from the facts that J.H. Wilkins sold miniature W & W hand puppets in 1958, that the hand puppets were marked as copyrighted, and that the copyrights were never registered or renewed.

In their initial memorandum, the defendants argued that J.H. Wilkins' production and distribution of the hand puppets was a publication of W & W by which J.H. Wilkins obtained copyrights in the Hensons' original incarnation of those characters.[10] Under the statute then applicable, the argument continues, those copyrights survived for an initial period of 28 years, *see* 2 Nimmer, *Nimmer on Copyright* § 9.01[C] (1992) (*"Nimmer"*) (discussing the 1909 Copyright Act), but expired in 1986 upon the failure of J.H. Wilkins to renew them. Having expired, the copyrights fell into the public domain and may not now be reclaimed as private assets.

The plaintiffs, in response, concede that whatever copyrights J.H. Wilkins obtained through its 1958 hand puppet promotion have become public property. The fallacy in the defendants' argument, the plaintiffs claim, is the assertion that the distribution of hand puppets based on the Hensons' designs gave

---

**8.** Moreover, even if the Hensons had developed a right to obtain trademarks in W & W by using them to represent the goodwill of their entertainment business, they could not have conveyed this right to J.H. Wilkins, since J.H. Wilkins bought W & W to represent the goodwill of its coffee business. Trademarks rights survive transfer only where the trademarks represent the same goodwill both before and after the transaction. *See Defiance Button Machine Co. v. C & C Metal Products Corp.,* 759 F.2d 1053 (2d Cir.), *cert. denied,* 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); *Marshak v. Green,* 746 F.2d 927 (2d Cir.1984).

**9.** The defendants' first counterclaim alleges that Henson Productions' copyright registrations for W & W are invalid and seeks a judgement ordering that they be cancelled.

**10.** Section 13 of the 1909 Copyright Act, in force at the time the hand puppets were produced, provided that an author or his assignee could obtain a copyright in a work merely by publishing copies of it bearing a proper copyright notice.

J.H. Wilkins copyrights in the designs themselves.

Acknowledging that the 1909 Copyright Act provided that copyright in a work could be obtained merely by its public distribution, *see* 17 U.S.C. § 10 (1909), the plaintiffs contend that the distribution of the hand puppets was not a distribution of the Henson designs because the hand puppets were derivative works rather than exact copies. Moreover, the plaintiffs' argument continues, under both the 1909 Copyright Act and its successor, "[t]he copyright in a . . . derivative work extends only to the material contributed by the author of such a work, as distinguished from the pre-existing material employed in the work. . . ." 17 U.S.C. § 103(b). *Accord Gilliam v. American Broadcasting Co.*, 538 F.2d 14 (2d Cir.1976). Accordingly, in the plaintiffs' view, the only copyrights J.H. Wilkins obtained through its hand puppet distribution were in its modifications of the Hensons' original puppet designs for W & W; copyrights in the original works themselves were unaffected and did not lapse upon the expiration of J.H. Wilkins' copyrights years later.

As defined by the 1976 Copyright Act, a "derivative work" is

a work based upon one or more preexisting works, such as a[n] . . . art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adopted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C. § 101. This definition applies to the J.H. Wilkins hand puppets, plaintiffs claim, because while the hand puppets were obviously based on the Hensons' creations, they are different in several important respects, such as size, color, and facial expression. In support of this assertion, the plaintiffs direct me to the affidavit of Henson Productions' Executive Vice President and Director of Creative Services, and puppet designer, Michael K. Frith, who reviews the hand puppets and concludes that they have "a different overall look and aesthetic appeal" from the Hensons' originals. *See* Frith 8/20/93 Aff. at ¶¶ 5–9. At the very least, plaintiffs say, the Frith affidavit creates a genuine issue of material fact as to the hand puppets status as derivative works, which precludes summary judgment on the copyright claims.

Apparently conceding that the relationship between the hand puppets and the Henson designs is a factual issue which bars summary judgment on their first theory, *see Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 35 (2d Cir.1982); *Sargent v. American Greetings Corp.*, 588 F.Supp. 912, 919 (N.D.Ohio 1984), the defendants, in their reply memorandum, advance a second theory. The second theory avoids the factual issue by assuming the hand puppets to be derivative works. Nevertheless, defendants say, it still leads to the conclusion that the copyrights in W & W are in the public domain. Development of the argument requires a brief explication of copyright law.

Before the Copyright Act of 1976, there were two regimes of copyright protection, common law copyright, which arose automatically upon the creation of a work, and statutory protection, which arose upon publication of the work and compliance with the requirements of the 1909 Copyright Act. A work was not permitted to enjoy both common law and statutory copyright protection simultaneously. Thus, upon publication of a work, its congenital common law protection withered and eligibility for statutory protection sprang up in its place. *See Roy Export Co. Estab. of Vaduz v. Columbia Broadcasting*, 672 F.2d 1095, 1101 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982).

Applying these principles, when J.H. Wilkins distributed its hand puppets, marked copyrighted as of 1958, the common law copyright on those works was forfeited in favor of statutory protection. This no one disputes. The defendants, however, contend that such distribution also extinguished the common law copyrights in the original versions of W & W as well. Publication of the derivative hand puppets, they reason, also constituted a publication of the elements shared by the original versions. 1 *Nimmer* § 4.12[A]. Consequently, the defendants

maintain, distribution of the hand puppets destroyed the common law copyrights on the original versions of W & W, leaving statutory copyright as the only means of protection for those works. No statutory copyrights were ever procured, the argument concludes, so when the copyrights on the hand puppets lapsed, causing the hand puppets to fall into the public domain, there was nothing to keep the Hensons' original designs, which had been incorporated into the hand puppets, from becoming public property as well.

The plaintiffs respond to this analysis by reference to the 1909 Copyright Act. They note that Section 7 of that statute provides:

> [O]ther versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works ... shall be regarded as new works subject to copyright under the provisions of this title; *but the publication of any such new works shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof,* or be construed to imply an exclusive right to such use of the original works, *or to secure or extend copyright in such original works.*

(emphasis added).[11] The plain meaning of this section, the plaintiffs claim, is that the publication of a derivative work does not alter or destroy copyrights in the original work. Moreover, they say, this rule is the same whether the copyright in the original work be common law or statutory. Accordingly, the common law copyright in the Hen-

sons' original W & W puppets survived the lapse of the hand puppet copyrights and, under the Copyright Act of 1976, will not expire until December 31, 2002, at the earliest.[12]

In *Stewart v. Abend,* 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990), the Supreme Court agreed with the plaintiffs' reading of the 1909 Copyright Act. Section 7, Justice O'Connor wrote, was intended to "limit[ ] the effect of the publication of the derivative work on the underlying work," so that "copyright in ... the pre-existing work ... is not abrogated by publication of the new work." 495 U.S. at 232, 231, 110 S.Ct. at 1766, 1765. In addition, the Court indicated that this rule applied regardless of whether the copyright in the underlying work was common law or statutory. *Id.* at 233, 110 S.Ct. at 1766 (the addition of the word "publication" to Section 7 of the 1909 Copyright Act was "to ensure that the publication of a 'new compiled work' without proper notice, including smaller portions that had not been previously published and separately copyrighted, would not result in those sections moving into the public domain."). *Accord Gilliam,* 538 F.2d at 19–20 n. 3 (Section 7's declaration that copyrights in derivative works do not affect the force or validity of copyrights in underlying works applies whether the underlying copyright is common law or statutory). *But see Roy Export Co.,* 672 F.2d at 1103–1104 n. 18 (describing note 3 in *Gilliam* as dicta).

---

**11.** Section 103(b) of the 1976 Copyright Act now carries forward the prior law's precept that the copyright or lack of copyright for a "new" work has no effect on the continued protection for the preexisting material. The House Report on the new act, accordingly, states:

> Section 103(b) is also intended to define, more sharply and clearly than does Section 7 of the present law, the important interrelationship and correlation between protection of preexisting and of "new" material in a particular work. The most important point here is one that is commonly misunderstood today: copyright in a "new version" covers only the material added by the later author, and *has no effect one way or the other on the copyright or public domain status of the preexisting material.*

H.R.Rep. No. 94–1476, 94th Cong., 2d Sess., p. 57 U.S.Code Cong. & Admin.News 1976, pp.

5659, 5670. (emphasis supplied). *Accord Rohauer v. Killiam Shows, Inc.,* 551 F.2d 484, 488–89 (2d Cir.) (Friendly, J.) (setting forth the pertinent legislative history of Section 7 of the 1909 Act and noting that [t]he ... objective was that nothing done by the proprietor of the derivative copyright should impair the underlying copyright), *cert. denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977).

**12.** The Copyright Act of 1976 eliminated the dual system of common law and statutory copyright by creating one federal system to protect all works and by giving statutory protection automatically to existing common law copyrights. 17 U.S.C.A. §§ 104(a), 301(a). Further, copyright protection for works created, but not published, copyrighted or in the public domain, before January 1, 1978, is guaranteed at least through December 31, 2002. *Id.* at § 303.

In view of *Abend*, I hold that the distribution of W & W hand puppets by J.H. Wilkins did not vitiate the common law copyrights in the Hensons' original designs of those characters.[13] The defendants' second summary judgment theory is, therefore, rejected, and none other having been offered, summary judgment on the copyright claims is denied.

## IV. Trademark Infringement, Unfair Competition, Dilution & Publicity

The defendants move for summary judgment on the plaintiffs' trademark infringement, unfair competition, dilution, and publicity claims on several grounds. These claims are all based on the defendants' use of the Muppet and Henson marks in connection with their efforts to market W & W.

■ The defendants' first argument for summary judgment is that they are entitled to truthfully describe W & W as Muppets created by Jim Henson. They rest their claim of entitlement on their status as copyright proprietors of W & W, the fact that W & W are in the public domain, and the fair use doctrine. The first two of these basis have been rendered indefensible by my holdings that the defendants are not successors of any copyright rights conveyed to J.H. Wilkins and that W & W are not in the public domain. All that remains to be considered, therefore, is the question of fair use.

The so-called "fair use" defense provides that use of a registered trademark by an unauthorized party does not constitute infringement where:

13. *Abend* notwithstanding, the authority cited by the defendants simply does not support their position. *Nimmer*, relied upon for the premise that publication of a derivative work is publication of the underlying work, goes on (in a section whose omission from the defendants' brief is of questionable judgement) to speak to the larger issue of the effect of such publication on the underlying copyright:

> The copyright in the preexisting (or underlying) work will not be vitiated if the new edition (or derivative work) is injected into the public domain for some reason other than publication without proper notice, *as, for example.... failure to renew·the copyright in the derivative work.*

1 *Nimmer* § 4.12[A] (emphasis added).

the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, ... which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin ...

15 U.S.C. § 1115(b)(4). According to the defendants, their use of the Henson and Muppets marks falls within this definition. They are not using the Henson and Muppets marks as trademarks, they say. Rather, they use those terms in good faith to accurately describe W & W as having been created by Jim Henson and belonging to the family of Muppets.

The fair use defense turns on an examination of the facts each case and, therefore, is rarely cognizable on summary judgment. *Cf. DC Comics Inc. v. Reel Fantasy, Inc.*, 696 F.2d 24, 28 (2d Cir.1982) (fair use defense to copyright infringement raises factual issues properly decided by jury). The instant case is not one of the exceptions to this rule. Numerous factual issues remain in dispute, most notably the descriptive accuracy of the marks as applied to W & W and the "fairness" of the defendants' use.

With regard to accuracy, the plaintiffs have introduced sufficient evidence to call into question the applicability of the term "Muppets" to W & W. While defendants would use the word to describe any of the puppets created by the Hensons or their company, the plaintiffs contend that the term has a more limited meaning, and they support their contention with affidavits or testi-

In addition, the defendants' reliance on *Classic Film Museum, Inc. v. Warner Brothers, Inc.*, 453 F.Supp. 852 (D.Me.1978), *aff'd*, 597 F.2d 13 (1st Cir.1979), is misplaced. Although holding that a common law copyright in an underlying work could not be asserted to restrict use of a derivative work in the public domain, the Court expressly declined to consider the issue of whether the common law copyright in the underlying story survived the publication of the derivative film. 453 F.Supp. at 854 n. 1. Moreover, the rationale of the decision—that allowing the assertion of the common law copyright in circumstances like these would give the copyright owner an unlimited monopoly—is no longer applicable given that common law copyrights are now temporally limited under the Copyright Act of 1976. *See* 17 U.S.C.A. § 303 (1977).

mony from numerous sources, including Jane Henson and Jerry Juhl. *See* Pearson 8/20/93 Aff. at ¶ 12(d); Schube 8/20/93 Aff. at ¶ 21. "Muppet," these witnesses say, refers not simply to the felt and plastic puppet forms generated by Henson Productions, but to the performance of those characters by Henson Productions-trained puppeteers, in a manner developed and sanctioned by the company. Loosed from the hands of Henson Productions' personnel, plaintiffs contend, W & W are no more Muppets than a "Sting Ray" with its engine removed is a "Corvette." It is too early to say whether the analogy in fact carries. However, the plaintiffs have provided enough evidence to take it to the fact-finder.

■ The same conclusion obtains on the question of the fairness of the defendants' use. Even where a registered trademark accurately describes another party's goods or services, use by the other party may still be unfair, and thus unlawful, if the mark is displayed in a misleading or confusing manner. *See* 1 *McCarthy* §§ 11.17[2], 11.17[3].

The defendants assert that their use of the Henson and Muppet marks is innocuous, merely a statement of origin, not intended to imply a current affiliation with Henson Productions. The plaintiffs, however, have made a showing which challenges the veracity of that position. Their evidence focuses on the defendants' conduct at the Twelfth Annual International Licensing and Merchandising Conference and Exhibition held in New York City on June 9–11, 1992. At that conference, the defendants set up a booth to promote their W & W licensing venture. As described in the affidavit of Peter Schube, the booth contained, *inter alia*, photographs of Jim and Jane Henson performing W & W, a prominent billboard and sign featuring the Muppet and Henson marks, and videotape footage of Wilkins commercials featuring W & W, such that "[t]he overall look and feel of the booth created the erroneous impression that plaintiffs had endorsed, authorized or approved of defendants' activities." Schube 8/20/93 Aff. at ¶ 22. The son of defendant John T. Brady, who manned the booth during the convention, confirms in his deposition that numerous attendees approached the booth and inquired about a possible connection between the defendants and Henson Productions. *See* Pl.Ex. 49 at pp. 150–151. This evidence is sufficient to raise a factual issue as to whether the defendants use of the Henson and Muppet marks is misleading. The question, like the one above, must be decided by the fact-finder, so the fair use defense cannot be the basis for summary judgment on the infringement, unfair competition, dilution, and publicity claims.

■ As a separate basis to support summary judgment dismissing those claims, at least insofar as they relate to the Muppet mark, the defendants assert that the plaintiffs and their predecessors have acquiesced in the description of W & W as Muppets.

■ Acquiescence is an equitable defense whereby relief may be denied a trademark owner who has, by word or deed, expressed consent to the defendant's use of its mark. *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,* 433 F.2d 686, 704 (2d Cir.1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971). As with other equitable defenses, its existence " 'depends upon a consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties.' " *Id.* at 703 (quoting the court below).

The defendants argue that the plaintiffs and their predecessors have manifested their assent to the use of the Muppet mark in connection with W & W over a period of 40 years. J.H. Wilkins, defendants contend, distributed advertising and promotional material describing the characters as Muppets without objection during the 1950s and 1960s. Similarly, in the 1980s and 1990s, Wilkins rebroadcast the original W & W commercials and made various other uses of the characters in commerce unopposed by the plaintiffs. Defendants also make much of the fact that the Hensons and Henson Productions have described W & W as Muppets in correspondence, contracts, and requests made to Wilkins for permission to use W & W in television specials and in press releases.

Assuming all of this to be true, summary judgment on the issue of acquiescence is still not possible. As discussed above, there is a

substantial factual dispute over the exact meaning of the term Muppet. Just as that dispute prevented summary judgment on fair use, it also bars summary judgment on acquiescence.

Plaintiffs, recall, contend that performance by Henson Productions' trained puppeteers is an essential element of a "Muppet." With that in mind, they argue that any past consent to Wilkins' or its predecessors using the term to describe W & W assumed the involvement of Henson personnel in performing and promoting the characters; for only under those circumstances would the label be accurate. At no time, the plaintiffs say, did they express or imply consent to the defendants' calling W & W muppets without their active participation in the characters' display:[14]

Of course, the defendants dispute all of this. They contend that a Muppet is a Muppet regardless of whose hand is inside, and therefore, that the plaintiffs' past consent gives them license to use the term in connection with their scheme to market W & W independently. It is not for me, however, to decide this factual issue on summary judgment; that is a job for the factfinder. Consequently, summary judgment on the basis of acquiescence is denied.

■ Finally, with respect only to the plaintiffs' claim for infringement of the late Jim Henson's right against unauthorized use of his name or likeness for commercial purposes—sometimes described as a right of publicity—the defendants move for summary judgment on the ground that no such right exists under Connecticut law.

The parties agree that Connecticut law governs any post-mortem right of publicity Jim Henson might have, since he died a citizen and resident of that state. Moreover, it is also undisputed that Connecticut affords no statutory right of publicity. The defendants, however, contend that Connecticut also affords no common-law right, particularly post-mortem, while the plaintiffs take the contrary position.

The plaintiffs direct me to the case of *Goodrich v. Waterbury Republican–American, Inc.*, 188 Conn. 107, 448 A.2d 1317, 1328–1329 (1982) as support for a right of publicity under Connecticut law. *Goodrich* was a privacy action wherein the plaintiff alleged that the defendant's publication of his financial affairs placed him in a false light before the public. The Connecticut Supreme Court, holding that such an action could be maintained, recognized a general cause of action for invasion of privacy, which included an action for false light. Also included, the Court said, was an action for "appropriation of [another's] name or likeness," 448 A.2d at 1329, and resting on that holding, the plaintiffs here assert that a claim for violation of one's right to publicity is viable under Connecticut common law.

The plaintiffs' conclusion does not follow. The privacy-based appropriation sanctioned in *Goodrich* is distinct from the publicity-based action sought to be maintained here by the plaintiffs. Both actions protect individuals from unauthorized exploitation of their identities. The theories behind them, however, are different.

The privacy-based action is designed for individuals who have not placed themselves in the public eye. It shields such people from the embarrassment of having their faces plastered on billboards and cereal boxes without their permission. The interests protected are dignity and peace of mind, and damages are measured in terms of emotional distress. By contrast, a right of publicity action is designed for individuals who have placed themselves in the public eye. It secures for them the exclusive right to exploit the commercial value that attaches to their identities by virtue of their celebrity. The right to publicity protects that value as property, and its infringement is a commercial, rather than a personal tort. Damages stem not from embarrassment but from the unauthorized use of the plaintiffs' property. *See* 2 *McCarthy* § 28.01[3] (discussing the distinction between privacy-based and publicity-

---

**14.** There is no dispute between the parties as to the fact that the plaintiffs sued promptly upon learning of the defendants' current plans.

based misappropriation actions and citing cases).

*Goodrich* addressed the existence of a privacy-based action without considering the similar, but separate, publicity-based claim. Consequently, the case cannot be read as recognizing the right of publicity under the common law of Connecticut. No other on-point Connecticut authority has been proffered or discerned, so I find the existence of a right of publicity, and the descendability of any such right, to be questions of first impression under Connecticut law. In such circumstances, I must attempt to discern how Connecticut's highest court would decide the issues and act accordingly. *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *C.I.R. v. Bosch's Estate,* 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

The right of publicity was first explicitly recognized by Judge Frank in *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.,* 202 F.2d 866 (2d Cir.), *cert. denied,* 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953). Since that groundbreaking opinion, half of the states have adopted the right of publicity one way or another. Sixteen states have recognized the right under their common law; nine others have statutes which embody the right. *See* 2 *McCarthy* § 28.04[1]; *Anderson v. Fisher Broadcasting Companies, Inc.,* 300 Or. 452, 712 P.2d 803 (1986). Perhaps more revealing, only two courts have expressly rejected the existence of a common law right of publicity. One of these held that the state's statute was preemptive; *see Stephano v. News Group Publications,* 64 N.Y.2d 174, 485 N.Y.S.2d 220, 474 N.E.2d 580 (1984). The other was later overruled by the state's

legislature; *see Carson v. National Bank of Commerce,* 501 F.2d 1082 (8th Cir.1974); Neb.Rev.Stat. §§ 20–201—20–211, 25–840.01 (1979).

I find no reason to believe that Connecticut would buck the apparent trend in the law towards recognizing the right of publicity. *Goodrich* demonstrates Connecticut's recognition of the general principal that a person's identity is a valuable commodity that should not be exploited absent the permission of its owner. *See also Steding v. Battistoni,* 3 Conn.Cir.Ct. 76, 208 A.2d 559 (1964). As noted above, *Goodrich* was a privacy case and thus recognized the psychic damages stemming from unauthorized exploitation. I am confident, however, that Connecticut would also recognize the economic damages that sometimes result and make them compensable as well. If anything, the latter are more easily recognizable and quantifiable than the former. For, in an age where star athletes make tenfold more from their endorsement contracts than from their team salaries, it denies reality to believe other than that an individual's persona can constitute valuable economic property. Moreover, the nature of that property is such that its value is diluted by unauthorized use.[15] One who makes such unauthorized use unjustifiably enriches himself at the expense of another, and that is disfavored under Connecticut law. *See Connecticut National Bank v. Chapman,* 153 Conn. 393, 216 A.2d 814, 817 (1966). I hold that Connecticut's high court would recognize a right of publicity.

The next question is whether Connecticut would construe the right of publicity to survive death so that one's heirs could sue for posthumous infringement.[16] According

---

**15.** Michael Jordan, for example, could hardly command millions of dollars from Nike to endorse their products if Reebok, Avia, and Converse could use him in their ads free of charge.

**16.** Defendants argue that the Court should avoid deciding what position Connecticut would take concerning the descendability of the right of publicity, relying on the Court of Appeals' decision in *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 221–222 (2d Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). There, the Second Circuit apparently reached the wrong conclusion as to whether New York court would recognize the descendability of the right of pub-

licity. Five years later, in *Stephano v. News Group Publications, Inc.,* 64 N.Y.2d 174, 485 N.Y.S.2d 220, 224, 474 N.E.2d 580, 584 (1984), the New York Court of Appeals held that New York's statutory provisions governing the right of publicity (*see* N.Y.Civ.Rights Law §§ 50, 51 (McKinney 1992)), which did not explicitly provide for the descendability of the right of publicity, were exclusive, and that no common law right of publicity exists under New York law. This issue does not arise under Connecticut law, which has no statutory section addressing the right of publicity.

the *McCarthy*, at § 28.06[4], "the overwhelming majority rule under either statute or common law is that the right of publicity is descendible property and has an unconditional postmortem duration." No state has adopted a statute limiting the right to living persons, and only one court decision to that effect remains controlling (and that decision is of limited persuasive value, having been made by a federal court opining as to the common law of Ohio). *Id.*

In *State ex. rel Elvis Presley Intern. Memorial Foundation v. Crowell*, 733 S.W.2d 89, 97–99 (Tenn.Ct.App.1987), a Tennessee state court cogently summarized the arguments for extending the rationale past death:

> First, it is consistent with our recognition that an individual's right of testamentary disposition is an essential right. If a celebrity's right of publicity is treated as an intangible property right in life, it is no less a property right at death. . . .

> Second, it recognizes one of the basic principles of Angle–American jurisprudence that "one may not reap where another has sown nor gather where another has strewn." . . . This unjust enrichment principle argues against granting a windfall to an advertiser who has no colorable claim to a celebrity's interest in the right of publicity. . . .

> Third, recognizing that the right of publicity is descendible is consistent with a celebrity's expectation that he is creating a valuable capital asset that will benefit his heirs and assigns after his death. . . .

> Fourth, concluding that the right of publicity is descendible recognizes the value of the contract rights of persons who have acquired the right to use a celebrity's name and likeness. The value of this interest stems from its duration and its exclusivity. If a celebrity's name and likeness were to enter the public domain at death, the value of any existing contract made while the celebrity was alive would be greatly diminished. . . .

> Fifth, recognizing that the right of publicity can be descendible will further the public's interest in being free from deception with regard to the sponsorship, approval or certification of goods and services. . . .

> Finally, recognizing that the right of publicity can be descendible is consistent with the policy against unfair competition through the use of deceptively similar corporate names.

(internal citations omitted). *Accord Acme Circus Operating Co. v. Kuperstock*, 711 F.2d 1538 (11th Cir.1983); *Factors Etc., Inc. v. Pro Arts, Inc., supra; Nature's Way Products, Inc. v. Nature–Pharma, Inc.*, 736 F.Supp. 245 (D.Utah 1990); *Presley's Estate v. Russen*, 513 F.Supp. 1339 (D.N.J.1981); *Martin Luther King, Jr., Center for Social Change, Inc. v. American Heritage Products, Inc.*, 250 Ga. 135, 296 S.E.2d 697, 705 (1982); *Price v. Hal Roach Studios, Inc.*, 400 F.Supp. 836 (S.D.N.Y.1975).[17]

The policies and goals relied on by the Tennessee court, things like consumer protection, protection of legitimate expectations, and prevention of unjust enrichment, are not uniquely important to Tennessee but rather are recognized by all states. I am of the opinion that the Supreme Court of Connecticut, like the vast majority of courts that have considered the issue, would find them relevant and persuasive. Accordingly, I hold that Connecticut would interpret the right of publicity as descendible. Summary judgment against the publicity claim is denied.

## V. Willful destruction of property

■ The defendants move for summary judgment on their sixth counterclaim against Jane Henson for willful destruction of property, characterized in their moving brief as a claim for conversion. The counterclaim arises out of Ms. Henson's actions at the June, 1992 convention, referred to above, where the defendants had set up a booth to promote their W & W licensing venture.

---

17. *Factors Etc.*, and impliedly *Price*, have been superseded by *Pirone v. MacMillan, Inc.*, 894 F.2d 579 (2d Cir.1990), where the Court of Appeals recognized the holding of the New York Court of Appeals in *Stephano v. News Group* *Publications*, 64 N.Y.2d 174, 485 N.Y.S.2d 220, 474 N.E.2d 580 (1984), that the state statutory provisions concerning a right of publicity, which limit the right to living persons, are exclusive.

The defendants allege that Ms. Henson destroyed and stole materials from the booth, thereby converting them.

Ms. Henson, according to her own deposition testimony, attended the convention, went to the defendants' booth, and grew "upset" and "outraged" at the prominent display of the Henson and Muppet marks, a posthumous tribute to Jim Henson by Life Magazine, and pictures of the Hensons working with puppets. She attempted to discuss her objections with the person staffing the booth but was rebuffed. In anger, Ms. Henson then tore up the defendants' promotional materials, pulled down the pictures of herself and her late husband, and grabbed the Life Magazine containing the tribute. She then left, taking the pictures and the magazine with her. *See* Def.Ex. 42.

Under New York law, "[c]onversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *Meese v. Miller*, 79 A.D.2d 237, 436 N.Y.S.2d 496, 500 (1981). The element of dominion or control may be satisfied by a showing that the defendant intentionally destroyed the property. *Veeco Instruments, Inc. v. Candido*, 70 Misc.2d 333, 334 N.Y.S.2d 321 (N.Y.Sup.Ct. 1972).

By Ms. Henson's own admission, she is responsible to the defendants for conversion of their photographs, their magazine, and their promotional materials. The latter property she destroyed, and the other items she took possession of in defiance of the plaintiffs' possessory rights. There is no serious dispute over the defendants' ownership of the property.

The plaintiffs argue that the defendants have not established the value of the property and that, whatever the value, the defendants suffered no damage since they had no right to reproduce, display and distribute the materials embodying photographs of the Hensons and plaintiffs' trademarks and characters. I am not convinced.

First of all, The plaintiffs overlook the defendants' uncontradicted evidence that the materials taken or destroyed were worth $1,211.59. *See* Def.Ex. 52. More importantly, as the plaintiffs themselves recognize, their arguments bear only on damages and not on liability. For regardless of the property's value and whether the production, distribution and display of the materials infringed on the plaintiffs' rights, the materials were still owned by the defendants. Assuming some infringement, the plaintiffs' remedy was to bring an action like that now before me, not to engage in violent self-help. By choosing the latter course, Ms. Henson committed the tort of conversion. Accordingly, the motion for summary judgment on the counterclaim is granted as to liability and as to damages in the amount of $1,211.59. The motion is denied with respect to the defendants' claim for punitive damages, since such damages require a showing of malice that has not been made. *See Veeco Instruments, Inc. v. Candido, supra.*

## VI. The Contract Claim

Finally, the defendants move for summary judgment dismissing the breach of contract claim based on the 1958 agreements. The theory of this claim is that the 1958 agreements granted J.H. Wilkins only limited rights in W & W, so that if the defendants are the successors of J.H. Wilkins, their assertion of complete dominion over the characters constitutes a material breach.

In view of the my holding that the defendants are not the successors to J.H. Wilkins' rights under the 1958 agreements, the breach of contract claim is insupportable. Summary judgment is therefore granted to plaintiffs.

### Conclusion

The plaintiffs' motion for summary judgment on their claim for declaratory relief is GRANTED.

The defendants' motion for summary judgment is GRANTED with respect to the plaintiffs' contract claim. Defendants' motion is also GRANTED with respect to liability and compensatory damages in the amount of $1211.59 on the defendants' counterclaim for

willful destruction of property. In all other respects, defendants' motion is DENIED.

SO ORDERED.