[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
The plaintiff, Peter Matos, brought this action against nine defendants, claiming publication on the Internet of false and defamatory information regarding a public official. On June 16, 1998 the court (Peck, J.) dismissed the action as against the defendants Michael Minney, Lois O'Connor, and Clarke King. On January 5, 1999, the court (Wagner, J.) granted the defendants' motion to strike the complaint against defendants AFSCME Council 4, Michael Ferrucci, Steve Carbone, and Dave LaPointe. The remaining defendants are the American Federation of State, County and Municipal Employees (AFSCME) Local 1565 and John Boyle.
The plaintiff's amended complaint alleges in Count I that the defendants, AFSCME Local 1565 and John Boyle, published defamatory statements on the Internet which harmed the plaintiff's reputation and good name in the community, impaired his business, social, religious and CT Page 11118 family relations, and caused the plaintiff grievous physical and mental suffering.
Count II of the plaintiff's amended complaint alleges the defendants, AFSCME Local 1565 and John Boyle, had knowledge of and acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed, causing the plaintiff harm to his privacy interests, mental stress, and "special damages."
Count III of the plaintiff's amended complaint, alleges that the defendants, intentionally caused the plaintiff severe emotional distress.
The defendant prior to trial filed a motion for summary judgment following a pre-trial conference where the pre-trial judge instructed that any motions for summary judgment were to be filed by November 15, 2000. The defendants filed their motion on November 13, 2000. The plaintiff argues that this motion be denied because the defendants failed to comply with the requirements of Practice Book §§ 17-44 and 17-45. Section 17-44 requires the party to obtain permission to file a motion for summary judgment after the case has been assigned for trial. The provisions of § 17-45 come into effect after permission is granted. Once notice is given of the granting of permission to file the summary judgment motion, the motion should be placed on the short calendar not fewer than fifteen days from the giving of the notice.
This court is inclined to recognize that the defendants could have assumed that since the pre-trial judge gave a date by which summary judgment motions were to be submitted they had permission to file their motion and did so within the requisite time. The motion had not been argued before trial. The court has taken it on the papers and concludes that there are genuine disputes as to material facts relating to the falsity and malicious intent of statements made in the article. Accordingly, the motion for summary judgment is denied.
The facts are as follows. The plaintiff, Peter Matos, is the Deputy Commissioner of the State of Connecticut Department of Corrections and a member of the Connecticut Hispanic Association of State Employees (CHASE). Until February 18, 1998, he was President of CHASE. The defendant, AFSCME Local 1565 (Local 1565) is a local unit of the AFSCME union which represents employees of the State of Connecticut Department of Corrections. The defendant, correction officer, John Boyle, is a member of Local 1565 and its corresponding secretary. Local 1565 owned the Internet site known as "www.99main, com/boyle007."
On January 29, 1998, John Boyle called the Department of Correction CT Page 11119 Public Information Office and asked to speak with the Public Information Captain, Beverly Pace. Captain Pace was not available and Officer Boyle spoke with Marcia Meehan, the secretary. He told her that he needed a statement from Captain Pace, concerning Deputy Commissioner Peter Matos taking $15,000 from the Chase Fund to bond out ex-captain Alfred Rodriguez. Boyle went on to state that he wanted a "politically correct" statement either confirming or denying the matter. Boyle stated he was going to print an article either with or without Captain Pace's statement since he already had enough information.
On January 29, 1998 at around 12:05 p.m. Captain Pace paged Matos and told him she received a call from officer Boyle asking about Matos' involvement with bonding Alberto Rodriguez out of jail. Boyle left telephone numbers where he could be reached. At around 12:20 p.m. Matos telephoned Boyle at his home. Boyle told Matos that the union was investigating a complaint about Matos being at the Hartford Correctional Center and bonding out Alberto Rodriguez. Also, that the union was in receipt of information that Matos had used CHASE funds to pay the bond.
Matos in that telephone conversation told Boyle that CHASE is a non-profit organization that does not get involved in bonding people out of jail; that, Rodriguez was bonded out by his family and Rodriguez Bail Bonds; that he, Matos, was not at the Hartford Correctional Center or in the vicinity at the time in question. Boyle told Matos that he was being investigated for undue familiarity in reference to ex-captain Rodriguez.
CHASE is a non-profit, non-political organization that sponsors educational conferences and social activities for Hispanic and non-Hispanic state employees. It was founded in 1990. Matos played a significant role in the formation of CHASE and has been the single most person responsible for its growth and its numerous activities. You think of CHASE and you think of MATOS. The treasurer of CHASE Luis Ayala maintains the checking account and dispenses CHASE funds. Checks require signatures of the treasurer and the president.
On February 4, 1998, an article appeared on the Union Local 1565 Internet home page containing the allegations. The article does not identify Matos or Rodriguez by name. Reference is made to a high ranking administrator. Rodriguez is referred to as being "employed by the DOC as a captain prior to his arrest.
The text of the article is preceded by a logo of a brain with a Puerto Rican flag on the brain. Just below the logo, the following appears:
 Anyone that belongs to the Connecticut Hispanic Association of State Employees otherwise known as CT Page 11120 "Chase" may want to look at where the organizations funds have been going over the past month. We are now in the process of investigating a complaint where a high ranking administrator used his position to acquire funds in order to bond out an inmate who raped an eleven year old. Apparently the inmate, was employed by the DOC as a Captain prior to his arrest. Some speculate that this inmate will likely "jump bond" as he is facing in the neighborhood of approximately 20 years. Yes the press is going to investigate, they have been monitoring this page closely since it came on line in January 98.
At that time the plaintiff was the president of CHASE and at that time the plaintiff was the only high ranking administrator who was of Puerto Rican descent.
Matos became aware of the article when it was brought to his attention by Captain Irizarry, a fifteen year employee of the Department of Corrections, who had received a phone call the morning of February 4, 1998, alerting him to the article.
That day and for one week thereafter at least ten Department of Corrections employees either telephoned Matos or spoke to him in person concerning the allegations contained in the Internet article.
On February 4, 1998, Matos was not aware of any Department investigation concerning CHASE and a high ranking administrator allegedly using funds to bond out an inmate who had raped an 11 year old. If such an allegation had been made the Department's Security Division would have conducted the investigation.
The investigation which did take place took place after the Internet article appeared and was authorized on February 4, 1998, by Commissioner John Armstrong. The allegations being investigated by the Department of Corrections originated from the telephone inquiry by Officer Boyle to the Department of Correction Public Information Office on January 29, 1998 and the subsequent article published on the Local 1565 Internet on February 4, 1998.
The investigation carried on by the Department of Corrections on February 6, 1998 included an interview with William Rodriguez, owner of Rodriguez Bail Bond who confirmed that the Rodriguez family had bailed Alberto Rodriguez out. On February 11, 1998 Hartford City Councilman Luis Ayala was interviewed by the Department of Corrections. Ayala is the treasurer of CHASE. He confirmed two signatures were required on all CT Page 11121 CHASE checks. He also stated no CHASE funds were used for the bond of Alberto Rodriguez.
On February 24, 1998 Officer Boyle was interviewed by the Department of Corrections. Officer Boyle stated the following:
 That on January 29, 1998, in his capacity as the Correspondence Secretary for Union Local 1565, he called Captain Beverly Pace at the Public Information Office requesting information about Deputy Commissioner Peter Matos and Alberto Rodriguez. He received e-mail from Union Local members informing him that Mr. Matos supposedly acquired funds from CHASE, then gave the funds to inmate Rodriguez' family to facilitate the bond. Captain Pace was unavailable and Officer Boyle left his home telephone number.
 Approximately 15-20 minutes later, he received a telephone call from Deputy Commissioner Peter Matos. Officer Boyle state that when he asked Mr. Matos if he bonded out an inmate this week, Mr. Matos was obviously mad and asked what business it was of the union. Officer Boyle replied that he was making the inquiry on the union's behalf because of the issues of undue familiarity and the union members who are also members of CHASE. According to Officer Boyle, Mr. Matos stated that CHASE only had $890.00 and could not bond out Rodriguez. Furthermore, Mr. Matos denied any involvement in bonding out Alberto Rodriguez.
 That he never made any comments to Beverly Pace's secretary about publishing an article with or without her comments. He may have informed the secretary about a newsletter he was working on for the union. As the correspondence secretary he handles incoming and outgoing correspondence, publishes the newsletter on the Internet and conducts investigations about matters brought forward by union members.
 That since talking to Mr. Matos, he received additional emails that two-(2) administrators signed over the mortgages on their houses to help with the bond. He doesn't know the identities the two administrators or who sent him the emails.
 On February 2, 1998 he attended a tri-local union meeting CT Page 11122 where the allegations were discussed. Afterwards, Officer Boyle states that he put out an article on the Union Local 1565 web page that we (the union) was looking into allegations that a high-ranking DOC administrator may have used CHASE funds to bond out an inmate. The article was general in nature and didn't identify anyone by name.
 On the weekend of February 7th/8th, he received a telephone call from a private citizen who identified himself as a member of CHASE. This person stated that the organization was embarrassed that its funds were used to bond out an inmate and asked the situation be left alone.
 On 2/10/98, he received legal mail from Mr. Matos' attorney that legal action was being considered against him for libel.
 Officer Boyle requested the matter be referred to the Auditor of Public Accounts or the State's Attorney for protection under the whistle blower statutes.
When asked about his sources of information by the Corrections investigator Officer Boyle stated he deleted the email messages sent to him regarding Matos. Boyle stated also that he did not recognize nor could he remember the names of people who sent him e-mail.
The investigation conducted by the Department of Corrections came to the conclusion that the allegation that Deputy Peter Matos posted the bond of former Department of Corrections employee, Captain Alberto Rodriguez, is unfounded, and that the allegation that Deputy Commissioner Peter Matos was present at the Hartford Correctional Center and used CHASE funds to bond out former Captain Alberto Rodriguez, is also unfounded. The report of the investigation with these conclusions was dated February 19, 1998.
Boyle has been employed as a corrections officer for ten years and has been a member of AFSCME Local 1565 for ten years. In January, 1998, he was corresponding secretary for AFSCME Local 1565 for ten years. His duties as correspondence secretary included designing and distributing a newsletter and creating a website. A letter dated April 16, 1997, from David LaPointe, President of AFSCME Local 1565 recognized his ideas for a website for the Local but in view of the fact that neither the Local's membership nor its executive board approved his use of either the Local's name or AFSCME's name, he was ordered to cease and desist from using those names for any website. CT Page 11123
On January 18, 1998, during the membership portion of an executive board meeting, Boyle was informed that Local 1565 approved his doing a website for Local 1565.
On January 29, 1998 the phone call by Boyle took place to Beverly Pace. Prior to this telephone call Boyle did nothing to confirm or deny the information he received from union members or by e-mail. Boyle did not check at court or with anyone else to determine if Rodriguez had been bonded out prior to or after his January 29, 1998, call. In his 1/29/98 call with Matos, Boyle was told by Matos that Rodriguez was bonded out by Rodriguez Bail Bonds. Boyle did not call the court to confirm this. On January 3, 2001, Boyle could not remember if Matos had given him this information. Nor was there any attempt to confirm with CHASE whether in fact their money had been used as Boyle's article on the Internet stated.
The website article existed for approximately one week. Boyle removed the article after he was told by David LaPointe that union members were receiving complaints that the article was racist.
Beginning in 1997 there were contract negotiations between several Department of Correction unions. Matos was part of the Department's management team for those negotiations. Joel Schweidel was employed by AFSCME, Council 4, as chief negotiator for State of Connecticut contracts involving some 18,000 state employees. In 1997, he and Matos were involved in negotiations involving the Department of Corrections and its some 5,000 membership. Matos had been one of the principal negotiators for the Department and even after the contract was negotiated, some union members were angry over the role played by the plaintiff during the negotiations.
On November 20, 1997 Schweidel attended a union meeting attended by three corrections unions, including Local 1565. During the meeting, some of the people present discussed how to smear Matos in an effort to prevent Matos's re-appointment by the Governor, how to "mess-up" the plaintiff's marriage and to embarrass him. One matter discussed was the plaintiff's using his position to help an employee of the Department, whose name it was believed was Rodriguez, who had been convicted of sexual assault. Schweidel at this meeting spoke out against the union interfering with the plaintiff's family life. Although Boyle was not present at this meeting, his name was mentioned by others at the meeting. Schweidel concluded from the statements made that Boyle was not a friend of the plaintiff.
Prior to February 4, 1998, the plaintiff, in his 18 years employment CT Page 11124 with the Corrections Department, had never been the subject of an internal investigation. After February 4, 1998, the plaintiff was not able to sleep for several weeks. On February 18, 1998, the plaintiff submitted his letter of resignation as President of CHASE. But for the website article the plaintiff would not have submitted his resignation. Although CHASE did not accept his resignation, Matos was not active for nine months. In a letter dated February 3, 1998, staff representative Don Sevas advised the presidents of Locals 387, 391, 1565 that per their instructions he had requested Commissioner Armstrong not bring Deputy Commissioner Matos to the labor-management meeting to take place on February 6, 1998.
The website article troubled the plaintiff as he was concerned that it could have prevented him from being reappointed to his position and he believed Department of Corrections employees he was in charge of would doubt his credibility and integrity. Although the plaintiff has been publicly criticized in his capacity as Deputy Commissioner of Corrections, prior to the publication of the website article he had never been accused of stealing or of taking money from an organization, his character and integrity had never previously been questioned and he had never previously been the topic of a website article which attacked him and his heritage.
Both plaintiff's wife and son were asked about the publication. Members of Chase asked the plaintiff about the article. The same day the article appeared the Commissioner of Corrections came into plaintiff's office and asked him about the article.
The plaintiff stipulates that he is a public official. In New YorkTimes Co. v. Sullivan, 376 U.S. 254, 279-80 (1964), the court held that a "public official" could recover damages for defamation relating to his official conduct only if he proved, by clear and convincing evidence, that a statement was made with "actual malice," that is ". . . with knowledge that it was false or with reckless disregard of whether it was false or not." In Curtis Publishing Co. v. Butts, 388 U.S. 130, 133
(1967), the court extended the "actual malice" to a "public figure."
The plaintiff claims that page two of the Internet article was not only false but that the statements were made with actual malice and caused actual damage. Where malice must be shown, the burden of proving the falsity of the defendant's statements is on the plaintiff. Perruccio v.Akenault, 7 Conn. App. 389, 392 (1986). The defendants contend that there is no need to reach the question of malice since the plaintiff's testimony makes it clear that the plaintiff cannot prove that the statement published on the Internet i.e. "we are now in the process of investigating a complaint . . ." is false; that, in fact, the plaintiff CT Page 11125 knew on January 29, 1998, that the defendant John Boyle, acting as a member of defendant AFSCME Local 1565, was investigating a complaint that the plaintiff had possibly used CHASE funds to bond out an inmate; that plaintiff's testimony fails to demonstrate that he has suffered actual damage as a result of that statement.
The plaintiff is the Deputy Commissioner of Corrections. As such he is a public official and he has so stipulated. The standard on a defamation case enumerated in New York Times Co. v. Sullivan, supra, where a public official is involved is that there be a finding of "actual malice" by clear and convincing evidence.
In determining whether actual malice was involved the court looks at the language used in the article, the logo preceding the text of the article and the circumstances surrounding publication of the article. The language accused the plaintiff of dishonesty and lack of integrity. The defendant takes the position that prefacing the sentence dealing with the substance of the complaint with the words, "we are in the process of investigating a complaint . . .," makes it all right. In other words according to the defendants so long as you say you are "investigating" you can lay out the substance of the situation under investigation without one scintilla of reliable information. In this case the defendant Boyle did not keep the e-mail he claims to have received. He did not remember the names of the persons sending him the e-mail. He claims phone calls from persons whose names he cannot remember. Prior to the publication of the article Boyle got a call from Matos who denied the claims Boyle made to Beverly Pace's secretary on January 29, 1998, and provided Boyle with information about who bonded Rodriguez out and the status of CHASE funds, none of which Boyle bothered to check out before going ahead and publishing the article four days later.
The logo of a brain upon which was superimposed the flag of Puerto Rico was claimed by Boyle to be an eye catcher and that it had no other significance. At the very least it served to identify the unnamed "high ranking administrator" accused of dishonesty and lack of integrity as Puerto Rican. In fact, the Puerto Rican members of Local 1565 demanded the article be taken off the Internet because they viewed it as racist.
Finally, looking at the circumstances surrounding the publication we find that some members of defendant Local 1565 harbored ill will toward the plaintiff because of his role in labor negotiations. At the November 20, 1998 union meeting members of Local 1565 discussed various ways to smear the plaintiff in an effort to harm him publicly and privately. The plaintiff's telephone conversation with Boyle on January 29, 1998, was an obvious reason for Boyle to have serious doubts about the veracity or accuracy of his allegations about the plaintiff. CT Page 11126
As to count one the court finds that the plaintiff has proven by clear and convincing evidence that the defendants John Boyle and AFSCME Local 1565, with reckless disregard of whether the defamatory statement was false published such statement through its website.
In count two the plaintiff's claim against the defendants is invasion of privacy by false light. In order to establish invasion of privacy by false light the plaintiff must show (a) the false light in which the other was placed would be highly offensive to a reasonable person, and the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." (citations omitted). Goodrich v. WaterburyRepublicans-American, Inc., 188 Conn. 107, 131 (1982). "The essence of a false light privacy claim is that the matter published concerning the plaintiff (1) is not true; . . . and (2) is such a "major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position. supra, 131.
The facts found are that the plaintiff had an unblemished reputation, that he was highly regarded in the community, that he had a superior work record with the Corrections Department which led to his appointment as its Deputy Commissioner, that he had never been accused of any wrongdoing or any kind of criminal activity. This article branded him a thief from the very nonprofit organization he had been instrumental in setting up and helping to expand. It also branded him as misusing his official position to help a felon.
Though the article does not name Matos as the person being referred to, enough information was given in the article to permit people who saw it to immediately identify Matos as the person being written about. And, in fact, that is what happened. The very day the article appeared Matos's name was connected to it by a number of persons who contacted Matos directly including his Superior, Commissioner of Corrections, Johnson.
The defendant cites Strata v. Conn. Newspapers, Inc., 193 Conn. 313
(1984) for the proposition that there can be no libel by innuendo if the challenged communication is true and concerns public officers and public affairs even though a false implication may reasonably be drawn by the public. The true statement that the defendants rely on is that the defendants were conducting an investigation and that even the plaintiff could not dispute the fact that the defendants could conduct an investigation. The issue is not about whether or not the defendants could conduct an investigation, but rather is about statements relative to that investigation which are not couched in the form of innuendos but rather CT Page 11127 as bald statements which make the person written about a thief and violator of his official position. They impugn his honesty and integrity.
The court finds that the plaintiff has proven by a preponderance of the evidence invasion of privacy by false light.
The plaintiff's claim in count three is intentional infliction of emotional distress by the defendants. In order to prevail on this claim the plaintiff had to prove the following four elements:
(1) the defendants intended to inflict emotional distress or they knew or should have known that emotional distress was the likely result of their conduct.
(2) the defendants' conduct was extreme and outrageous.
(3) the defendants' conduct caused the plaintiff's distress.
(4) the emotional distress sustained by the plaintiff was severe.
De'laurentes v. City of New Haven, 280 Conn. 225, 266-267 (1991);Barber v. Mulrooney, 61 Conn. App. 108, 111 (2000).
One of the essential elements of this tort is that defendants' conduct was extreme and outrageous; that is "conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." 597Supra Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. Appleton v. Board of Education, 254 Conn. 205,210 (2000).
On the facts found this court concludes that the statements were made with actual malice; that the conduct was extreme and outrageous; that the conduct did cause the plaintiff distress; and that the emotional stress sustained was severe.
The defendants have pled six special defenses as follows: first that a statement of opinion is insufficient to sustain plaintiff's action for libel; second, that defendants are entitled to the privilege of fair comment in that such privilege applies to expressions of opinion; third, that defendants are entitled to the conditional privilege to which all citizens are entitled when engaged in matters of public interest; fourth, that defendants are entitled to the defense of truth since the statement "we are now in the process of investigating a complaint . . ." CT Page 11128 was true; defendants are protected by article §§ 4, 5, and 14 of the Connecticut Constitution; sixth, that defendants are protected by theFirst and Fourteenth amendments to the United States Constitution.
Other than to cite authorities dealing with opinion statements and the privilege of fair comment as this applies to opinions, the defendant does nothing to relate those to the instant case. The same is true as to the third special defense dealing with conditional privilege where matters of public interest are involved. Accordingly, these special defenses are found not to have been proven by a preponderance of the evidence. As for the constitutional issues of free speech, since this court has found that the plaintiff was maliciously libeled, the freedom of speech defenses fail. The only special defense the defendants focus on is the fourth special defense, the defense of truth.
As to the defense of truth, the defendants' position is that by prefacing the false and defamatory statements with the words, "we are in the process of investigating a complaint where", makes the false accusations against Matos true and, therefore, not defamatory, especially since Matos is a public official. The Connecticut Supreme Court in Stradav. Connecticut Newspapers, Inc., 193 Conn. 313 (1984) stated that "truthful statements which carry a defamatory implication can be actionable." Defendants published statements that were meant to, and did defame the plaintiff. After reading these statements many DOT employees who worked with MATOS told him that they viewed the defendants' statements as accusing Matos of stealing money from Chase to bond out an inmate. While Strada does recognize that truthful statements that carry a defamatory implication are not actionable against a public official, that holding is subject to the limitation that such statements are protected "unless known to be false or printed with reckless disregard for the truth." Strada at 324.
In this case, plaintiff spoke with Boyle and provided him with information that showed these accusations were false and did not have any basis. Boyle went ahead and published them anyway. The statements carried a defamatory implication that the defendants published with reckless disregard for the truth of such allegations. Accordingly, the defendants have failed to prove by a preponderance of the evidence their fourth special defense.
The court looks next to the issue of agency and concludes from the facts found that Boyle when he published the subject article on the Local's Website did so as the agent of Local 1565.
The approval given to Boyle by Local 1565 at the January 18, 1998 meeting put no conditions of pre-approval by Local 1565 of anything CT Page 11129 published by Boyle on the Website. Boyle was authorized to do the Website for the Local and was given a free hand as to what would appear on it. The fact that Boyle did not have specific approval of the Local for the subject article does not relieve the Local of liability' for Boyle's actions.
The court finds for the plaintiff on all three counts of the complaint. The court next considers the damages to be awarded. As to counts one and two, the court takes into consideration the length of time the plaintiff's reputation and good name were under a cloud and his privacy interests were impinged upon. Once the DOT investigation cleared Matos and the Internet article was removed, which was within a month of the publication of the article, things quieted down. The court awards monetary damages of $5,000 as to count one and $5,000 as to count two.
As to count three the court is satisfied from the facts found that the plaintiff suffered significant emotional stress and awards $25,000 in monetary damages as compensation.
Since the court has found actual malice the court awards punitive damages which consist of attorneys fees. A hearing will be held to receive evidence upon which the court will make a determination as to reasonable attorneys fees which should be awarded the plaintiff.
Finally costs will be allowed upon submission of a bill of costs.
Accordingly, judgment may enter in favor of the plaintiff Peter Matos against the defendants American Federation of State, County and Municipal Employees, Local 1565 and John Boyle as to counts one, two and three. Monetary damages are awarded in the amount of $5,000 as to count one, and in the amount of $5,000 as to count two. As to count three monetary damages of $25,000 are awarded together with punitive damages to be determined at a subsequent hearing. Costs are also allowed.
Hennessey, J.